**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Robert Anderson DAVIS, Jr., Leo Glen Nash and William A. Tyer, Defendants-Appellants.**

**No. 86–2501**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Jan. 20, 1987.

Randall L. Rogers, Whitehouse, Tex. (Court-appointed), for defendants-appellants.

Bob Wortham, U.S. Atty., Beaumont, Tex., Robert James Delahunty, Atty., U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for plaintiff-appellee.

Before REAVLEY, JOHNSON, and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

Three guards from a Texas state mental hospital challenge the sufficiency of the evidence supporting their conviction, under 18 U.S.C. § 241, of conspiring to violate the civil rights of a patient. Because we hold that the jury's conspiracy verdict was supported by substantial evidence, we affirm.

## I. BACKGROUND

Robert Anderson Davis, Jr., Leo Glen Nash, Anthony G. Baker, Harold E. Hicks and Frank Southerland worked, in June 1983, as Psychiatric Security Technicians (hereinafter "guards") on the night shift at the Maximum Security Unit of the Rusk State Hospital in Texas. William A. Tyer worked as shift supervisor. Gary Lee Salas and Troy Volk were patients in Dormitory 4 at the same unit. Salas was an admitted drug user who had been committed following a long history of convictions for burglary, theft, robbery, and retaliation against a witness. Volk had a history of suicide attempts, drug use, and other psychiatric problems; had two rape convictions; and had been committed to Rusk for pretrial evaluation.

On the night of June 21, 1983, another Dormitory 4 patient, Jay Banks, was beaten and suffered an epileptic seizure. Salas testified that he had seen guards beating Banks in the dormitory in the middle of the night. One of the guards noticed Salas watching from his bed and according to Salas, told him to "cover up or [he] would get more of the same." Record Vol. 4 at 138. Salas also testified that the next day the guards warned the patients, "[Y]ou all quit messing with us, and we'll quit messing with you all." Record Vol. 4 at 139. Troy Volk also heard the disturbance and got out of bed. He testified that he saw another patient trying to help Banks and heard a guard yell "that you better get in bed, or you'll get the same." Record Vol. 4 at 206.

Banks' beating was investigated by a hospital patient abuse committee on June 22, 23, and 24. Tyer was not called, because June 21 was his night off; Davis, Nash, Baker, and Hicks did testify. Tyer admitted at trial, however, that he knew of the investigation. Salas and Volk testified in support of Banks. Witnesses in such investigations waited to testify in a room where they were visible; moreover, the hospital had an active "grapevine" about abuse committee investigations.

On June 24, 1983, the night shift gathered in the nurse's station around 10 p.m. There was conflicting testimony at trial about the topic of conversation. Davis, Nash, and Southerland testified that the guards talked about the abuse committee hearing; Tyer testified that they did not. Southerland also testified that all the guards knew that patients had talked to the committee and that Salas and Volk's names were mentioned specifically.

Rusk State Hospital has a video system that normally is set to rotate and provide surveillance from one area to another every few minutes. The pictures can be monitored from the nurse's station and are also stored on tape. The guards could see that Salas and Volk were watching television in Dormitory 4, and Tyer proposed that the guards go and turn the set off. Tyer, Davis, Nash and Hicks headed for the dorm, in Southerland's words, "looking for trouble." Record Vol. 5 at 426.

The video tape, which was shown at trial, shows the four guards walking down the hall and entering the dorm together. It shows Davis, Nash, and Hicks grabbing a patient and taking him to the floor. Tyer apparently is standing behind. At that point, Baker, who had remained at the nurse's station, switched the camera away and joined the others.

Salas and Volk testified that the four guards went first to Bank's bed and asked him who testified at the abuse committee hearing. Banks replied, "[I]t's the Mexican out on the couch." Record Vol. 4 at 147. The four guards encircled the couch and, according to Volk, Tyer said, "[D]on't you s.o.b.'s know that we get paid to kick—kick ass." Record Vol. 4 at 216. The guards demanded Salas' belt, claiming that he was going to hang himself with it, although in fact Salas had permission to wear a belt and had no record of suicidal tendencies. Salas testified that, before he could answer, he was grabbed by the hair, knocked to the floor, kicked, and kneed in the chest and back. Salas stated that he thought all four guards participated. Volk testified that Tyer announced to the patients in the

lounge that "we can't get away with telling on them, that we better not mess with their boys—better not mess with his boys." Record Vol. 4. at 218.

The four guards carried Salas down the hallway to an isolation room. Baker joined them in the hall and punched Salas several times. In the isolation room, Salas was beaten again by "four or five" guards for five to ten minutes. Record Vol. 4 at 153–54. Salas was then taken to Dormitory 1, where the guard meeting Tyer's description [1] ordered another patient, Cleo Austin, to beat Salas. Because the two patients were friends, Austin only pretended to hit Salas. Salas testified that the guard meeting Tyer's description said, "[I]f you talk, you're going to be hanging in the morning; if anybody talks, we're going to kill them." Record Vol. 4 at 156. Salas remained in Dormitory 1 and reported his injuries the next morning.

Holding Salas' belt, Tyer and Davis went to Volk's room. They asked Volk if he had seen Salas try to attack Tyer with the belt. Volk denied the attack. Volk testified that Tyer said, "[T]his son-of-a-bitch is going to cause us trouble." Record Vol. 4 at 225. Then "at least four" of the night guards began to beat Volk. *Id.* The next day, a doctor's report noted that Volk had a black eye, a two-inch bruise on the neck, a chest bruise, and scratches on his ankle.

Tyer submitted conflicting reports of the events of June 24. In his "Progress Note" on Salas for that date, he stated that Salas had attacked a guard and had to be restrained and transferred to another dormitory. In a Day Book entry for June 24, Tyer wrote that Volk and Salas had been abusing other *patients.* Although the hospital required an "Unusual Occurrence Report" whenever a patient attacked either a guard or another patient, none of the guards filed such a report. Nash and Baker both admitted that Tyer's Progress Note was false.

A grand jury indicted Davis, Nash, Baker, Hicks, and Tyer with three counts of conspiracy against constitutional rights (18 U.S.C. § 241) and deprivation of rights under color of state law (18 U.S.C. § 242). Baker pleaded guilty to the section 242 violation of Salas' rights. A jury convicted the other defendants on the conspiracy charges and on the section 242 charges concerning Salas. The defendants were acquitted on the section 242 charges concerning Volk. The district court sentenced the defendants to three years' imprisonment, suspended all but six months, and required them to render community service. Davis, Nash, and Tyer appeal.

## II. DISCUSSION

Davis, Nash and Tyer do not dispute that they beat Salas, but they argue that the jury did not have sufficient evidence to find that they acted as part of a conspiracy. This Court will uphold a jury verdict in a criminal case so long as "there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979) (quoting *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978)); *see also United States v. Kimble,* 719 F.2d 1253, 1256 (5th Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

In order to obtain a conviction for criminal conspiracy, the Government must prove beyond a reasonable doubt that (1) a conspiracy directed to an unlawful purpose existed; (2) the defendant knew of the conspiracy; and (3) the defendant voluntarily agreed to join that conspiracy. *United States v. Aguirre Aguirre,* 716 F.2d 293, 297 (5th Cir.1983); *United States v. Bobo,* 586 F.2d 355, 368 (5th Cir.1978), *cert. denied sub nom, Rowan v. United States,* 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979). The first element, existence of a

---

**1.** Salas did not know the guards' names, but he and the other patients consistently identified Tyer as "short," "fat," and with a "funny nose."

*E.g.,* Record Vol. 4. at 155. The defendants do not contest their identifications on appeal.

conspiracy, can be proved by showing that two or more people agreed to pursue an unlawful objective together and at least one of them performed an overt act to further that objective. *United States v. Wheeler,* 802 F.2d 778, 782 (5th Cir.1986); *United States v. McKenzie,* 768 F.2d 602, 606 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). Thus, the Government must prove agreement both to establish a conspiracy and to show a particular defendant's participation in it.

The defendants argue that the Government has not proved that they acted in agreement, rather than independently, when they beat Salas. It is true that the record contains no statements to the effect of "Let's go and beat up Salas for testifying against us." However, the agreement element of conspiracy can be proved by circumstantial evidence. *United States v. Holcomb,* 797 F.2d 1320, 1327 (5th Cir. 1986); *McKenzie,* 768 F.2d at 606; *United States v. Grassi,* 616 F.2d 1295, 1301–02 (5th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). Among the circumstances that the courts have found probative of conspiratorial agreement are: sharing a common motive (*United States v. Ellis,* 595 F.2d 154, 160 (3d Cir.), *cert. denied,* 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979) (police officers who beat suspects)); presence in a situation where one could assume participants would not allow bystanders (*United States v. Cruz Valdez,* 773 F.2d 1541, 1546 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986) (crew member on ten-day voyage of ship carrying a thousand pounds of marijuana)); repeated acts (*United States v. Camacho,* 528 F.2d 464, 469 (9th Cir.), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976)); mutual knowledge with joint action (*McKenzie,* 768 F.2d at 606; *Ellis,* 595 F.2d at 160); and the giving out of misinformation to cover up (*Ellis,* 595 F.2d at 160).

Most of these factors are shown by substantial evidence in the instant case. The guards had the common motive of discouraging patients from testifying to the abuse committee. Southerland, Nash, and Davis told the jury that the night shift guards were complaining about the abuse committee just before starting toward Dormitory 4. Tyer denied this, but the jury was entitled to resolve the credibility issue against him. *McKenzie,* 768 F.2d at 605. Other remarks made in the course of the evening by Tyer and other guards warned patients against reporting abuse.

There was testimony that Tyer, Davis, Nash, Hicks, and Baker all beat patients in one another's presence. None of the guards protested the beatings or attempted to stop them. The beatings were repeated several times over the course of several hours. The guards acted jointly, encircling Salas; some helped the others by holding him while the others delivered blows. During the beatings, the guards spoke to each other about them. Finally, they cooperated in a cover up: Baker switched the video camera away, and Tyer filed admittedly inaccurate reports of the incidents. In sum, the evidence negates individual, spontaneous action. Instead, it strongly supports the jury's conclusion that the beatings formed part of a conspiracy which each defendant joined knowingly and voluntarily.

### III. CONCLUSION

The jury heard substantial evidence to prove that there was a conspiracy to violate patients' civil rights and that each defendant guard agreed to join that conspiracy. Accordingly, the convictions are

AFFIRMED.