UNITED STATES of America,
Plaintiff–Appellee,

v.

A. Larry TULLOS, Sidney D. Fazio
and Michael E. Blanton,
Defendants–Appellants.

No. 88–3280.

United States Court of Appeals,
Fifth Circuit.

March 10, 1989.

Sam J. D'Amico, Baton Rouge, La. (Court-appointed), for Tullos.

L. Eades Hogue, Thomas J. Byrne, Jr., Dirk Van Ausdall, New Orleans, La., for Fazio.

Brian G. Comeaux, Baton Rouge, La. (Court-appointed), for Blanton.

Edward J. Gonzales, Asst. U.S. Atty., P. Raymond Lamonica, U.S. Atty., Baton Rouge, La., for U.S.

Before BROWN, JOHNSON, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge.

Larry Tullos, Sidney Fazio and Michael Blanton appeal their convictions for financial improprieties associated with several loan transactions from a federally insured savings and loan institution. Tullos and Fazio were convicted on twelve counts of making false entries in Sun Belt Federal Bank's books, three counts of willful misapplication of Sun Belt's funds, and conspiracy to make false entries and misapply funds. Blanton was convicted on four counts of aiding and abetting the making of false entries. We find no error and affirm.

## I.

This case arises out of several loans made by Sun Belt Federal Bank in Louisiana shortly before it was closed by the FSLIC, which insured Sun Belt. During the period covered by the indictment, appellant Tullos was the president of the bank and a member of the bank's executive loan committee. One of Tullos' co-defendants, Fazio, was the attorney for the bank; the other co-defendant, Blanton, was a major borrower from the bank. Viewing the evidence, as we must, in a light most favorable to the verdict, the jury was entitled to find the following facts from the evidence presented at trial.

In 1983, while Tullos was president of Sun Belt, the Federal Home Loan Bank Board ("Board") examined the bank's records and criticized several unsound loans, including a $5,000,000 loan, to a partnership in Lafayette, Louisiana, that was secured by a Lafayette trailer park. Tullos reviewed the report with the Board examiner, Anderson, and assured him that Sun Belt would take steps "to cure detected deficiencies and to improve the overall posture of Sun Belt." Anderson marked the five million dollar loan for follow-up review.

By May 1984, the $5,000,000 Lafayette loan was still in default and Sun Belt foreclosed on the trailer park. A St. Tammany

Parish, Louisiana real estate broker, Seaborn Wicker, suggested to his friend, Tullos, how Sun Belt might dispose of the Lafayette trailer park. Wicker advised Tullos that several principals of Baton Rouge Petroleum Center (Baton Rouge Petroleum) and Miller Development Corporation of Louisiana (Miller Development) were willing to purchase the trailer park, provided that Sun Belt loaned them sufficient funds to buy the trailer park and to develop other properties in St. Tammany Parish. Tullos ultimately agreed to this proposal. He explained to George Bevan, the attorney for Baton Rouge Petroleum and Miller Development, that he had to sell the trailer park by May 30 because "the auditors were coming and he wanted it off his books."

Tullos later met with George Dabbs, Cecil Pennington and Ted Miller, the principals of Baton Rouge Petroleum and Miller Development, and agreed to lend them $8,300,000. The borrowers agreed to use $3,000,000 of the loan proceeds to purchase the trailer park. Although the borrowers were concerned that they would not qualify for an $8,300,000 loan, Tullos assured them that he would "handle that end of it."

On May 16, 1984, William Hardin, Sun Belt's chief lending officer, presented the bank's executive loan committee with applications for three loans totalling $8,300,000: $3,750,000 to Baton Rouge Petroleum, $3,750,000 to Miller Development and $800,000 to Ridgeland Builders, Inc. (Ridgeland Builders), a construction company owned by defendant Blanton. Tullos was present at the executive loan committee meeting when it approved all three loans. The documents presented to the loan committee stated that the purpose of the loans was to develop property in St. Tammany Parish. None of the borrowers' filings or Tullos' remarks at the committee meeting suggested that any part of the loans would be used to purchase the Lafayette trailer park.

On May 30, 1984, the three loans were closed in the office of Sun Belt's lawyer, defendant Fazio. Dabbs, Pennington and Miller, the principals of Baton Rouge Petroleum and Miller Development, and Bevan, their attorney, were present at the closing. Tullos, Wicker and Blanton were also present. The Baton Rouge Petroleum and Miller Development borrowers were surprised, however, that Blanton attended the closing. Tullos told one of the borrowers, Dabbs, "to cool down, that it was all right, that [Blanton] was part of the closing—don't worry about it." Blanton stated to Bevan that he was at the closing "to do Sidney [Fazio] a favor." Similarly, Tullos explained to Dabbs and Miller that Blanton had been included as a strawman or nominee in the loan so that the bank would not exceed the legal loan limit to the actual borrowers.

At the closing, all borrowers signed loan agreements with Sun Belt for the purchase of an undivided interest in St. Tammany property. The Miller Development and the Baton Rouge Petroleum borrowers each acquired a 45% undivided interest in the property. Blanton acquired a 10% undivided interest. In the loan agreement, the borrowers noted that they were not acting as nominees in the transaction for other parties. The borrowers also signed "loans-to-one-borrower certificates," attesting that they were not exceeding the legal loan limits of the Bank. In addition, Blanton signed two documents; a written guaranty for his company's $800,000 loan and his company's actual promissory note. The $8,300,000 loan was deposited in Fazio's real estate trust account at Sun Belt, to be disbursed by Fazio.

Fazio disbursed the loan funds in the following manner: $4,500,000 to the seller of the St. Tammany property; $526,918 to the Baton Rouge Petroleum and Miller Development borrowers; $20,000 to his firm (of which he paid $5,000 to Blanton); and $3,000,000 to Sun Belt for the Lafayette trailer park. To conceal the fact that Sun Belt funds had been loaned for the purchase of the trailer park, Fazio transferred $3,000,000 from his real estate trust account at Sun Belt to his real estate trust account at another bank. Later, he transferred the $3,000,000 to Sun Belt to fund the purchase of the trailer park. The remaining funds covered expenses of the

sale, such as closing points, appraisal fee, and title search. Blanton never received the $800,000 he purportedly borrowed.

Immediately following the closing, Fazio prepared a "counter letter," signed by the Baton Rouge Petroleum and Miller Development principals, Blanton and Fazio. The counter letter stated that the St. Tammany "property was placed in the name of Ridgeland Builders, Inc. for convenience and in truth and in fact, the property was acquired for the joint benefit of Baton Rouge Petroleum Center, Inc. and Miller Development Corporation of Louisiana ..." The Baton Rouge Petroleum and Miller Development borrowers "agree[d] to hold Ridgeland Builders, Inc. free and harmless from the payment of the debt represented by the [Sun Belt] note." At the same time, Blanton executed a cash sale of his company's ten percent interest in the St. Tammany Parish property to Baton Rouge Petroleum and Miller Development. The borrowers left these documents with Fazio.

Fazio next prepared two different closing statements summarizing the transaction. Fazio sent the first statement to Sun Belt which falsely showed the following disbursements on the $8,300,000 loan:

| | |
|---|---|
| Abba Development (Seller) | $8,000,000 |
| Sun Belt Federal Bank (Points) | 207,500 |
| Howard Kindig (Appraiser) | 7,500 |
| Stewart Title Insurance Co. | 15,582 |
| Smith & Lindsey | 5,000 |
| McCollister, McCleary, Fazio & Holliday | 20,000 |
| McKinnis, Juban | 17,500 |
| To Borrower | 26,918 |
| TOTAL | $8,300,000 |

Fazio sent a different closing statement to the borrowers, which showed the following, accurate, disbursements on the $8,300,000 loan:

| | |
|---|---|
| Abba Development (Seller) | $4,500,000 |
| Sun Belt Federal Bank (Points) | 207,500 |
| Sun Belt (Trailer park) | 3,000,000 |
| Howard Kindig (Appraiser) | 7,500 |
| Stewart Title Insurance Co. | 15,582 |
| Smith & Lindsey | 5,000 |
| McCollister, McCleary, Fazio & Holliday | 20,000 |
| McKinnis, Juban | 17,500 |
| To Borrower | 526,918 |
| TOTAL | $8,300,000 |

Fazio did not forward to Sun Belt the second closing statement, the "counter letter" or records of Blanton's cash sale to Baton Rouge Petroleum and Miller Development.

In late 1984, in part due to the cash sale of the Lafayette trailer park loan, Sun Belt passed its Board inspection.

Within a year, Baton Rouge Petroleum and Miller Development were unable to meet the first installment on their notes. Tullos approved an additional loan to the Baton Rouge Petroleum and Miller Development principals, via a third corporation, so they could pay the interest due on the three prior loans. None of these loans has been repaid and Sun Belt failed in May 1986.

In March 1988, a federal jury convicted Tullos and Fazio on sixteen counts of making false entries in reports to Sun Belt Federal Bank, a violation of 18 U.S.C. § 1006 [1] and 18 U.S.C. § 2.[2] Tullos and Fazio were also convicted of willful misapplication of Sun Belt's funds, a violation of 18 U.S.C. § 657,[3] and conspiracy to make

---

1. Section 1006 states in pertinent part that an officer, agent or employee of:

   any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... with the intent to defraud any such institution ... or to deceive any officer, auditor, examiner or agent of any such institution ... makes any false entry in any book, report or statement of or to any such institution, or without being duly authorized, draws any order or bill of exchange, makes any acceptance, or issues, puts forth or assigns any note, debenture, bond or other obligation ... or, with intent to defraud the United States or any agency thereof ... participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   18 U.S.C. § 1006 (1956).

2. Section 2 states:

   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

   18 U.S.C. § 2 (1951).

3. Section 657 provides in pertinent part that an officer connected in any capacity with a:

   credit or savings and loan corporation or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal

false entries and misapply funds, a violation of 18 U.S.C. § 371.[4] Blanton was convicted of aiding and abetting four violations of the false entries statutes, a violation of 18 U.S.C. § 1006 and 18 U.S.C. § 2.

The defendants appeal their convictions, alleging numerous errors: (1) there was insufficient evidence to support their convictions; (2) prosecutorial misconduct deprived them of a fair trial; and (3) the trial court erroneously admitted evidence tending to show the bad character of the defendants. In addition, Tullos and Fazio contend that the trial court erroneously excluded exculpatory evidence—the deposition of Seaborn Wicker—which would have shown that Wicker, not Tullos, originally orchestrated the scheme to tie the purchase of the Lafayette trailer park to a loan for the St. Tammany property. We review each of these complaints below.

## II.

### A.

The appellants first attack the sufficiency of the evidence to support their convictions. "The standard of review of the sufficiency of the evidence is whether a 'reasonable trier of fact could [have found] that the evidence establishe[d] guilt beyond a reasonable doubt.'" *United States v. Punch*, 722 F.2d 146, 153 (5th Cir.1983), quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Under this standard, we evaluate the evidence in a light most favorable to the jury's verdict.

*United States v. Punch*, 722 F.2d at 153. Before discussing the evidence against the defendants, we summarize the elements of the offenses below.

■ In order to convict for criminal conspiracy under § 371, the Government must prove the following elements beyond a reasonable doubt: (1) that two or more people agreed to pursue an unlawful objective together; (2) that the defendant voluntarily agreed to join the conspiracy; and (3) that one of the members of the conspiracy performed an overt act to further the objectives of the conspiracy. *See United States v. Davis*, 810 F.2d 474, 476–77 (5th Cir. 1987).

■ To establish that the defendants willfully misapplied funds under § 657, the Government must prove beyond a reasonable doubt: (1) that Sun Belt Federal Bank was a lending institution authorized and acting under the laws of the United States; (2) that the accused was an officer, agent or employee of the bank; (3) that the accused knowingly and willfully misapplied funds belonging to Sun Belt; and (4) that the accused acted unlawfully and with intent to injure or defraud the bank.[5] *See United States v. Stovall*, 825 F.2d 817, 823 (5th Cir.1987).

■ The offense of making false entries under § 1006 includes the following elements: (1) that Sun Belt Federal Bank was a lending institution authorized and acting under the laws of the United States; (2) that the accused was an officer, agent or employee of the bank; (3) that the accused

---

Savings and Loan Insurance Corporation ... and whoever, being a receiver, embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise entrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both ...
18 U.S.C. § 657 (1948).

4. Section 371 states:
    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons to any act to effect the object of the conspiracy, each shall

be fined not more than $10,000 or imprisoned not more than five years, or both.
    If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. 18 U.S.C. § 371 (1948).

5. Tullos objects to the § 657 jury instruction. He alleges that the instruction should have been "injure and defraud" rather than "injure or defraud." Either an intent to injure or an intent to defraud is sufficient to maintain a conviction under this section. *See U.S. v. Angelos*, 763 F.2d 859, 861 (7th Cir.1985).

knowingly and willfully made, or caused to be made, a false entry concerning a material fact in a book, report, or statement of the bank; and (4) that the accused acted with intent to injure or defraud the bank, or any of its officers, auditors, examiners or agents. *Id.* at 822.

■ Finally, to convict an accused for aiding or abetting an offense against the United States, the government must establish that the " 'defendant was associated with the criminal venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed.' " *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir.1978), quoting *United States v. Martinez,* 555 F.2d 1269, 1272 (5th Cir. 1977).

■ The record contains ample evidence of a scheme by Tullos, Fazio and others to deceive the Board of Directors of Sun Belt Bank and federal inspectors of the full use of the $8,300,000 in loan proceeds. The defendants concealed their plan to use $3,000,000 of these proceeds to clear the Lafayette trailer park from Sun Belt's books. To avoid problems with regulations imposing single borrower loan limits, the defendants also concealed the nominee or strawman role of Blanton and his corporation, Ridgeland Builders. Tullos' participation in the scheme was graphically portrayed by Dabbs, Miller and Pennington, the actual borrowers in the transaction, who testified of their direct dealings with the bank president. Dabbs stated that "[w]hile we didn't really want [the trailer park], it was a method for us to get our financing for the [St. Tammany Parish property]." When the lending officer presented to the loan committee three applications for loans to purchase real estate in St. Tammany Parish, Tullos did not correct the misinformation contained in the applications. Instead, he permitted the executive loan committee to approve the loans without disclosing the true purpose of $3,000,000 of loan proceeds.

Fazio's participation in the scheme is also adequately demonstrated in the record. The jury was entitled to conclude that he arranged for Blanton to appear at the loan closing and purported to receive $800,000 of the loan so that the loan limit to the actual borrowers would not be exceeded. The jury was also entitled to conclude that Fazio paid Blanton $5,000 to participate in the scheme. The dual loan closing statements also demonstrate Fazio's knowledge of, and direct participation in, the loan scheme. The closing statement Fazio sent to Sun Belt failed to disclose that $3,000,000 of the loan proceeds purchased the bank's trailer park. The closing statement sent to Sun Belt grossly inflated the purchase price of the St. Tammany property. This same statement, intended for consumption by innocent bank employees, board members and federal auditors, revealed that Blanton (and his company) were actual borrowers and recipients of $800,000 of the loan proceeds. The jury was entitled to conclude from the overwhelming evidence covering this transaction that Fazio was a knowing, willing participant in the scheme. This evidence includes the counter letter (reflecting that Blanton received no proceeds from the loan and had no obligation to repay any portion of the loan), Blanton's cash sale of his 10% interest in the St. Tammany Parish property, and Fazio's transfer of $3,000,000 from his real estate trust account to another bank, and then to Sun Belt, for the purchase of the trailer park.

The evidence supports the jury's finding that Tullos and Fazio participated in, and caused false entries to be made in three commitment letters, three loan agreements, Blanton's written guaranty and promissory note, three loans-to-one-borrower certificates and the closing statement sent to Sun Belt's files.[6] The jury was entitled to find

---

6. The twelve counts of making false entries were based on the following documents (1) a commitment letter from Sun Belt to Ridgeland Builders, which omitted the fact that Ridgeland Builders was acting as a nominee in obtaining an $800,000 loan; (2) a loan agreement between Sun Belt and Ridgeland Builders which omitted the fact that Ridgeland Builders was acting as a nominee in obtaining an $800,000 loan; (3) a written guaranty by Blanton of an $800,000 loan from Sun Belt to Ridgeland that omitted reference to Tullos' verbal assurance that neither

that Tullos and Fazio knew the true facts and made false entries in bank reports to perpetrate the scheme.

With respect to the willful misapplication of Sun Belt's funds, the jury was entitled to determine that Tullos and Fazio disbursed $800,000 to a strawman who would not be responsible to repay the loan, and $7,500,000 to two corporations which falsely inflated the value of the security for the loan.[7] The jury was entitled to find that the loan committee would not have approved the loan if it had known that $3,000,000 of the proceeds were targeted to clear the trailer park from the bank's books. Similarly, but for the role of the strawman, Blanton (and his company, Ridgeland), the loan would have exceeded the Bank's single loan limit and the bank would not have made the loan. This evidence was sufficient to support the jury's finding of guilt on three counts of misapplication. *See United States v. Stovall*, 825 F.2d 817 (5th Cir.1987) (affirming bank vice-president's conviction for misapplying agricultural loans for nonagricultural purposes); *United States v. Adamson*, 700 F.2d 953, 965 (5th Cir.), *cert. denied*, 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116

(1983) (holding that knowing participation in a deceptive or fraudulent transaction is appropriate mens rea for willfully misapplying funds with intent to injury or defraud a bank).

Tullos argues that the government was required to establish that he intended to defraud the bank to establish the offense of making false entries. Although the evidence may very well support that conclusion, the government was not required to prove Tullos' intent to cause the bank injury; all it was required to prove was that Tullos intended to defraud any of the bank's officers, auditors, examiners or agents. *See Stovall*, 825 F.2d at 822. The evidence was clearly sufficient to show that Tullos intended to mislead or deceive the innocent officers and board members of the bank, as well as the federal inspectors.

Fazio argues that the jury was not entitled to reject his explanation that he submitted a false closing statement to the bank, which listed Blanton and his corporation as borrowers, because he held a good faith belief that he was not required to inform the bank of Blanton's nominee status. The jury rejected Fazio's good faith explanation, which it clearly was entitled to

---

Ridgeland Builders nor Blanton would have to repay the loan; (4) an $800,000 promissory note of Ridgeland Builders that failed to indicate that Ridgeland Builders was a nominee for Baton Rouge Petroleum and Miller Development; (5) a commitment letter from Sun Belt to Baton Rouge Petroleum, which falsely indicated that the sole purpose of a $3,750,000 loan was to fund the purchase of property in St. Tammany Parish; (6) a commitment letter from Sun Belt to Miller Development Corp., which falsely indicated that the sole purpose of a $3,750,000 loan was to fund the purchase of property in St. Tammany Parish; (7) a loan agreement between Sun Belt and Baton Rouge Petroleum, which falsely indicated that the sole purpose of a $3,750,000 loan was to fund the purchase of property in St. Tammany Parish; (8) a loan agreement between Sun Belt and Miller Development Corp., which falsely indicated that the sole purpose of a $3,750,000 loan was to fund the purchase of property in St. Tammany Parish; (9) a loans-to-one-borrower certificate of Baton Rouge Petroleum, which omitted reference to Ridgeland Builders, a nominee with an outstanding balance with Sun Belt; (10) a loans-to-one-borrower certificate of Miller Development, which omitted reference to Ridgeland Builders, a nominee with an outstanding bal-

ance with Sun Belt; (11) a loans-to-one-borrower certificate of Ridgeland Builders, which omitted reference to Baton Rouge Petroleum and Miller Development, corporations on whose behalf Ridgeland was acting as a nominee, and who owed loan balances to Sun Belt; and (12) a closing statement which showed a false distribution of the proceeds of loans by Sun Belt to Baton Rouge Petroleum, Miller Development and Ridgeland Builders.

7. The three counts of willful misapplication of Sun Belt's funds are based on the following acts: (1) the disbursement of an $800,000 loan to Blanton, a nominee who would not be responsible to repay the loan, and in a manner to conceal a violation of Sun Belt's lending limit; (2) the disbursement of a $3,750,000 loan to Miller Development in such a manner as to hide that some portion of the loan would purchase the Lafayette trailer park and that the loan could not be repaid in accordance with its terms; and (3) the disbursement of a $3,750,000 loan to Baton Rouge Petroleum in such a manner as to hide that some portion of the loan would purchase the Lafayette trailer park, and that the loan could not be repaid in accordance with its terms.

do. *See United States v. Punch,* 722 F.2d at 153.

■ Blanton argues that the loan documents he signed contain no false entries because he contends he was responsible for the $800,000 note he signed in favor of the bank. But the jury was entitled to find that Blanton's willingness to assume liability for the note was a hollow attempt to avoid a criminal conviction. The counter letter that Blanton signed contemporaneously with the other loan instruments established that he acquired no proceeds of the loan and had no ultimate liability for repayment of the loan because the true borrowers, Baton Rouge Petroleum and Miller Development, agreed to indemnify Blanton from any liability to Sun Belt. The jury was entitled to find that Blanton agreed to appear in a transaction as a strawman or nominee when in fact he received *no* property or benefit from the loan. This evidence supports his conviction on four counts of aiding and abetting the making of false entries.

After a careful review of the record, we conclude that the evidence was sufficient to support the defendants' convictions.

### B.

Appellants next complain that the prosecutor's misconduct deprived them of a fair trial. They argue that their case was unfairly prejudiced by liberal name-calling in which the prosecutor called all defendants liars and Fazio, in particular, a "crooked lawyer," a "flunky," and a "slick talking lawyer[ ]" who spoke with "a serpent's tongue."

■ Defendants failed to object to these statements at the time they were uttered,[8] but nonetheless argue on appeal that the prosecutor's statements were so egregious that a new trial is required. Because the defendants failed to make a contemporaneous objection to the prosecutor's remarks, we must determine whether the prosecutor's statements "rose to the level of 'plain error' ... warranting the court to overlook the absence of any objection by the defense." *United States v. Young,* 470 U.S. 1, 14, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). Under the plain-error exception to the contemporaneous objection rule, this court is permitted to correct only "those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 15, 105 S.Ct. at 1046, quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

We begin from the bedrock premise that a prosecutor is permitted to "prosecute with earnestness and vigor—indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). *See also United States v. Young,* 470 U.S. at 7, 105 S.Ct. at 1042. The record reveals that the prosecutor's remarks in this case, while strong, were based on solid record evidence. The evidence at trial focused on the false statements the defendants made orally, and through documents presented to the bank, to deceive bank officers, board members and bank examiners as to the nature and purpose of the loan and the identity of the borrowers. The particular untrue oral and written statements have been discussed above and need not be repeated. In sum, the prosecution focused on the defendant's lies. When the prosecutor repeatedly characterized the defendants as "liars" in a case such as this, it can hardly be called a "foul" blow.

---

8. None of the defense counsel objected to the prosecutor's use of the word "lie" or "liar" until well after the words had been stated. Indeed, the trial was nearly concluded when counsel for Tullos moved for a mistrial for improper statements. Tullos claimed:

"And in addition may I say this at this time, and I may as well move for a mistrial again on another ground while we are in recess: I have tried to keep up with the number of times that the prosecution has used the word 'lie' and 'lies' ...."

Next, counsel for Blanton objected to the phrase "slick talking lawyers." The trial judge immediately admonished all counsel to "eliminate the personifications" and clearly instructed the jury that the attorneys' remarks were not evidence.

■ Appellant Blanton raises an additional allegation of misconduct. He complains that the prosecutor violated his Fifth Amendment rights by suggesting in closing argument that Blanton, who presented no defense, should have called Harry Adcock, a bank loan officer. But, as Blanton acknowledges, the prosecutor's remarks followed Blanton's own suggestion that the prosecution should have called Harry Adcock, the Sun Belt loan officer who helped to close the three loans to Baton Rouge Petroleum, Miller Development and Ridgeland. In response to Blanton's argument, the prosecutor remarked, "Why hasn't Harry Adcock been called?"

Blanton argued to the jury that Adcock would have exonerated him of any culpability if only the government had called the witness. In response, the prosecutor reasoned that if Adcock's testimony would have aided Blanton, it was in Blanton's interest to call him as a defense witness. The defendant's comments clearly invited the prosecutor's reply. *See United States v. Young,* 470 U.S. at 11, 105 S.Ct. at 1044.

Our review of the entire record persuades us that the prosecutor's remarks did not deny the appellants a fair trial.

## C.

The defendants next argue that the trial court erroneously admitted evidence of extrinsic acts that fell under no hearsay exception and tended to show the bad character of the defendants. Although the five acts at issue pertained to Fazio, Blanton contends that the prejudicial evidence had a "spill over" effect on his defense. Tullos adopts the argument in Fazio's brief, but alleges no specific effect that the evidence had on his defense.

After Fazio testified that he never knowingly submitted false closing statements to Sun Belt, the prosecutor introduced evidence showing discrepancies between other completely unrelated closing statements Fazio prepared for the bank and his own internal office memoranda. Specifically, some of this evidence showed that Fazio issued duplicate bills to the bank for his legal service. In each instance, the bill sent to the bank for Fazio's services was for a larger amount than the version of the bill retained in his law firm records. The government also introduced similar evidence that Fazio billed the bank for reimbursement of a higher appraisal fee than Fazio actually paid, and higher than the law firm records revealed that Fazio paid.

■ Fazio contends that this evidence was introduced to show he was cheating his law partners, had a bad character and was probably involved in the scheme with Tullos. Extrinsic acts evidence is obviously not admissible under Federal Rule of Evidence 404(b) for this purpose:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

But evidence of this nature can be used to establish intent on the part of a defendant or absence of good faith mistake. Fazio's defense was based on precisely this contention. He testified that he did not intend to mislead the bank by the representations in the closing statement he sent to the bank. He also testified that he did not know that he was required to advise the bank that one of the borrowers was a strawman. This "good faith" defense placed Fazio's intent at issue. The extrinsic acts evidence of repeated inconsistent bills he sent to the bank, arguably analogous to the duplicate closing statements he transmitted in this case, was admissible to rebut Fazio's contention of mistake. Moreover, the court issued an appropriate limiting instruction on the use of extrinsic acts evidence. This evidence was obviously prejudicial to some extent, but because of the critical importance of Fazio's defense of mistake and lack of fraudulent intent, the district court did not abuse its discretion in finding that the probative value of the evidence outweighed its prejudicial effect.

The evidence had little or no reference to Blanton or Tullos and we perceive no prejudice to them from this evidence.

### D.

 Last, defendants Tullos and Fazio complain that the trial court erroneously excluded exculpatory evidence, the deposition of real estate agent Wicker, which would have shown that the idea to tie the purchase of the Lafayette trailer park to a loan for the St. Tammany property originated with Wicker and not Tullos.

The evidence at issue is a deposition of Wicker taken in the civil litigation between the Miller Development and Baton Rouge Petroleum principals and Sun Belt Federal Bank. Wicker gave his deposition before the appellants were indicted. At trial, Fazio called Wicker as a defense witness, but Wicker refused to testify, exercising his rights under the Fifth Amendment. Fazio then moved to compel Wicker's testimony, or in the alternative, to admit his civil deposition. The district court upheld Wicker's Fifth Amendment privilege and similarly refused to admit Wicker's deposition under the belief that civil depositions can never be admitted against a witness who exercises his Fifth Amendment privilege in a criminal trial.

On appeal, Tullos and Fazio argue that Wicker's deposition is admissible under Federal Rule of Evidence 804(b)(1) under the former testimony exception to the hearsay rule.[9] Assuming without deciding that the district court erred in refusing to admit relevant portions of Wicker's deposition testimony, *see United States v. McDonald,* 837 F.2d 1287, 1292–93 (5th Cir.1988), that error was harmless. The defendants were not indicted and tried for originating an idea or plan to package a real estate development loan with the sale of the bank's nonperforming Lafayette trailer park. The defendants were indicted and tried for the deceptive manner in which they carried out

this plan, including submitting false information to a federally insured bank and misapplying bank funds. Also, the defendants, as well as the borrowers, testified that Wicker first suggested tying the development loan to the purchase of the trailer park. At best, Wicker's deposition was cumulative evidence that was already before the jury. Consequently, the district court's refusal to admit Wicker's deposition was not reversible error.

### III.

Having found no error in the convictions of Larry Tullos, Sidney Fazio and Michael Blanton, the district court's judgment is

AFFIRMED.

---

**9.** Rule 804(b)(1) states:

Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination.