# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2402
_____

United States of America

*Plaintiff - Appellee*

v.

Travis Hewitt

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: February 19, 2021
Filed: June 8, 2021
[Published]
_____

Before SMITH, Chief Judge, WOLLMAN and STRAS, Circuit Judges.
_____

PER CURIAM.

Former Jackson County Detention Center (JCDC) Corrections Officer Travis Hewitt appeals his conviction for (1) conspiring to deprive James Ramirez, a pretrial detainee, of his civil rights, in violation of 18 U.S.C. § 241; and (2) depriving Ramirez of his civil rights, in violation of 18 U.S.C. § 242. On appeal, he challenges

the sufficiency of the evidence for both of his convictions and the reasonableness of his sentence. We affirm the judgment of the district court.[1]

I. *Background*[2]

On July 2, 2015, Ramirez was admitted to the JCDC in advance of a hearing on an alleged probation violation. At the time of his admission, he was suffering from alcohol withdrawal. He was placed in the medical housing unit on the second floor of the JCDC so that staff could monitor his status and provide him with medication.

While in the medical housing unit, Ramirez was "unaware of where he was at," "confused," and "disoriented." Trial Tr. vol. 2, at 92, 106, 107, *United States v. Hewitt*, No. 4:17-cr-00136-GAF (W.D. Mo. 2020), ECF No. 209. On July 4, 2015, at approximately 7 p.m., Ramirez attempted to leave the medical housing unit. Corrections Officer Irene Haines struggled with Ramirez before radioing a "code one officer involved." *Id.* at 93. This radio call indicated that "an officer needs assistance immediately." *Id.*

Hewitt and Corrections Officer Dakota Pearce were on the fourth floor of the JCDC when they heard the radio call. They immediately went to the medical housing unit on the second floor. Hewitt "[t]hrew [Ramirez] to the ground." *Id.* at 293. Pearce handcuffed him behind his back. While Ramirez was handcuffed and on the ground, Pearce punched him "more than once" in the side with a closed fist "out of anger" for Ramirez fighting with a female staff member. *Id.* at 298. Pearce also witnessed Hewitt "punch[] Mr. Ramirez in the face at least three times" with a closed fist. *Id.* at 299. Corrections Officers Shavon Brown and Katie Milton observed the incident from the

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

[2]"[W]e recite the facts in the light most favorable to the verdict[]." *United States v. McArthur*, 850 F.3d 925, 931 (8th Cir. 2017).

doorway of the medical housing unit. Brown saw Hewitt hit Ramirez in the face "[m]ultiple" times with "[s]hort, close jabs." Trial Tr. vol. 1, at 67, *United States v. Hewitt*, No. 4:17-cr-00136-GAF (W.D. Mo. 2020), ECF No. 208. Milton saw Hewitt "deliver[] approximately five blows to [Ramirez's] face" in "short, backhanded hits." Trial Tr. vol. 2, at 99–100. Hewitt admitted to hitting Ramirez in "three rapid strikes," but he claimed he did so in response to Ramirez biting him. Trial Tr. vol. 4, at 169, *United States v. Hewitt*, No. 4:17-cr-00136-GAF (W.D. Mo. 2020), ECF No. 211. He wrote in his report that he used "suppressive force" in response to Ramirez biting him. *Id.* at 131.

The Control Emergency Response Team (CERT) arrived minutes later. CERT Team Officers Jen-I Pulos and Terrance Dooley took Ramirez to a nearby holding cell for medical evaluation.

Following the incident, officers took a break outside on the porch on the first floor. The officers began discussing the code one. While "[e]verybody was pretty upset about it," Hewitt "was upset the most. He . . . verbally voiced that you don't put your hands on women, you don't do that." Trial Tr. vol. 2, at 308. He also stated, "I bet . . . [Ramirez's] mouth doesn't feel too good after that." *Id.* at 104. Hewitt "was walking around with his chest kind of puffed up a little bit." *Id.* He "said that he was happy that he had got his licks in." Trial Tr. vol. 3, at 290, *United States v. Hewitt*, No. 4:17-cr-00136-GAF (W.D. Mo. 2020), ECF No. 210.

Around 9:30 p.m., Pearce asked Hewitt to accompany him to Ramirez's cell to deliver medication. After departing Ramirez's cell, the two officers discussed a comb they claimed to have seen in the cell that had been altered into a shank. Hewitt was "very adamant about going and getting it and not wanting to get the lieutenant involved." Trial Tr. vol. 2, at 322–23. But Pearce "went and spoke with the lieutenant about it." *Id.* at 322. The lieutenant instructed Pearce to "[g]o get [the shank]." *Id.* at 324.

Shortly thereafter, Pearce returned to the second floor. Upon his return, Pearce saw Brown, Pulos, Dooley, and Hewitt in a semicircle around the second-floor desk. Brown was on the phone with the lieutenant, who instructed her to go retrieve the shank out of Ramirez's cell. In response, Hewitt stated, "F\*\*k that, Brown. We got it." *Id.* at 330. Hewitt was "quite upset." *Id.*

At approximately 10:30 p.m., Pulos and Dooley went to Ramirez's cell in the medical housing unit to retrieve the shank. They "detain[ed] [Ramirez] on the floor of his cell" and "put him in wrist restraints and leg restraints." Trial Tr. vol. 3, at 303. Pulos and Dooley then walked Ramirez to a large holding cell without surveillance cameras on the second floor. They "expected to inflict pain on" Ramirez when they got to the holding cell. *Id.* at 307.

Once inside the holding cell, Pulos put Ramirez on the floor with his hands behind his back, still handcuffed. Using his full weight, Pulos put his knee into Ramirez's back twice "[t]o inflict pain and to let him know to never do this again to another officer." *Id.* at 310. Ramirez was not threatening or resisting. Pulos then got up, and "Dooley proceed[ed] to take his turn," stating, "Now it's time for me to get my licks in." *Id.* at 311. Dooley punched Ramirez twice in the face with full force.

"At this point, Officer Hewitt walk[ed] into the cell . . . ." *Id.* at 312. Hewitt told Ramirez, "You think that was bad, you haven't—ain't nothing happened yet." *Id.* Hewitt proceeded to yell and cuss at Ramirez, stating, "You're not going to f\*\*\*ing do anything like this" and "You got away with not going in the restraint chair." *Id.* at 313. Next, Hewitt "punche[d] [Ramirez] in the face, and then he proceed[ed] to then kick him in his back." *Id.* According to Pearce, who had also entered the cell, "Hewitt picked Inmate Ramirez up by his jumpsuit and threw him against the wall." Trial Tr. vol.2, at 343.

Afterwards, Hewitt warned Pulos and Pearce to stay quiet. He told Pulos, "If you f***ing say anything about this, I will kill you." Trial Tr. vol. 3, at 317. And Hewitt told Pearce that "[he] was next" if he said anything. Trial Tr. vol. 2, at 350.

Around 3:30 a.m. the next morning, Jennifer Wood, the registered nurse on duty, requested that Ramirez be sent to the hospital "[b]ecause his vital signs were outside of the normal range with some of what he was experiencing." *Id.* at 202. Wood was unaware of Ramirez's physical injuries; she sent him to the hospital "to rule out alcohol withdrawal." *Id.* at 203.

Ramirez was taken to Truman Medical Center, where he was treated by Dr. Adam Stuppy. Although Dr. Stuppy "was expecting to be treating a gentleman for alcohol withdrawal," he was instead "faced with a gentleman who had obviously suffered . . . some traumatic injuries." *Id.* at 268. Dr. Stuppy diagnosed Ramirez with pulmonary contusion (bruising of the lung); pneumothorax (punctured lung or collapsed lung); homothorax (internal bleeding); facial contusions (facial bruising); multiple rib fractures; thoracic spine injury; spinal fractures; and a wrist fracture. According to Dr. Stuppy, Ramirez's injuries were "consistent with blunt force trauma." *Id.* at 270.

Following the incident, Hewitt, Pearce, Dooley, and Pulos were indicted for conspiring to deprive Ramirez of his civil rights, in violation of 18 U.S.C. § 241 ("Count 1"), and depriving Ramirez of his civil rights, in violation of 18 U.S.C. § 242 ("Count 2"). Hewitt and Pearce were also charged with the earlier altercation that occurred in the medical housing unit. Both were charged with depriving Ramirez of his civil rights, in violation of § 242 ("Count 3"), and Hewitt was charged with making a false entry in a document with the intent to impede, obstruct, and influence the investigation and proper administration of that matter, in violation of 18 U.S.C. § 1519 ("Count 4"). Prior to trial, Pulos pleaded guilty to Count 2, and Pearce pleaded guilty to Count 1. Hewitt and Dooley pleaded not guilty and proceeded to trial. The

jury found Hewitt and Dooley guilty on Counts 1 and 2. The jury acquitted Hewitt on Counts 3 and 4.

At sentencing, the district court calculated a Guidelines range of 87 to 108 months' imprisonment. Neither party objected to this sentencing range. Hewitt requested time served or, alternatively, a sentence no longer than the 36-month sentence that the court had imposed on Dooley. The government asked the court to impose a Guidelines sentence.

Hewitt objected to information included in the presentence report (PSR) relating to the first incident in the medical housing unit for which he had been acquitted. The court denied the objection, stating, "I think that it's proper to have that in the presentence report, but none of the matters that relate to the charges for which Mr. Hewitt was acquitted are matters that I take into consideration at all in terms of fashioning an appropriate sentence." Sentencing Tr. at 6, *United States v. Hewitt*, No. 4:17-cr-00136-GAF (W.D. Mo. 2020), ECF No. 251.

Ultimately, the district court varied downward from the Guidelines range and sentenced Hewitt to 45 months' imprisonment on Counts 1 and 2, to run concurrently. The court characterized Hewitt's conduct as "a horrendous act" and "very egregious." *Id.* at 14. The court noted that "Ramirez was an extremely vulnerable individual and . . . sick person. . . . whose safety and care was entrusted to [Hewitt] as an officer in the Jackson County jail." *Id.* Hewitt, the court observed, "abused that trust and that position, that duty that [he] had as an officer in a very egregious manner, and the evidence was that Mr. Ramirez probably wouldn't have survived if somebody else didn't intervene on his behalf." *Id.* at 14–15. Instead of saving Ramirez, "[i]t was [Hewitt] that hurt him." *Id.* at 15. The court found that Hewitt's "behavior was more extreme and contributed in a more serious way to the injury that Mr. Ramirez suffered than that of Mr. Dooley." *Id.* According to the court, Hewitt was "more responsible for the injuries that were suffered by Mr. Ramirez." *Id.*

## II. *Discussion*

On appeal, Hewitt argues that the evidence is insufficient to sustain his convictions on Counts 1 and 2. In addition, he challenges his sentence as substantively unreasonable.

### A. *Sufficiency of the Evidence*

We first address Hewitt's challenge to the sufficiency of the evidence. "'[W]e review de novo the sufficiency of the evidence to sustain the conviction,' viewing the evidence in the light most favorable to the jury's verdict, resolving all conflicts in favor of the verdict, and accepting all reasonable inferences that support the verdict." *United States v. Reichel*, 911 F.3d 910, 915 (8th Cir. 2018) (quoting *United States v. Whitlow*, 815 F.3d 430, 435 (8th Cir. 2016)). "[W]e do not question credibility determinations made by the jury" when evaluating the sufficiency of the evidence. *United States v. Close*, 518 F.3d 617, 620 (8th Cir. 2008). "A jury is free to believe or reject a witness's testimony in part or in whole." *Id.* We will not reverse unless "no reasonable jury could find all the elements beyond a reasonable doubt." *Reichel*, 911 F.3d at 915 (quoting *Whitlow*, 815 F.3d at 435).

### 1. *Count 1*

Hewitt argues that insufficient evidence supported his Count 1 conviction under 18 U.S.C. § 241. Section 241 makes it unlawful for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." "For a conspiracy against rights, the Government must prove 'an actual agreement between two or more persons to accomplish a prohibited object.'" *United States v. Blakeney*, 876 F.3d 1126, 1131 (8th Cir. 2017) (quoting *United States v. Morado*, 454 F.2d 167, 169 (5th Cir. 1972)). Here, Hewitt challenges the existence of an agreement between himself, Dooley, Pulos, and Pearce to assault Ramirez in retribution for Ramirez's altercation with a female officer.

Direct evidence of an explicit agreement is not necessary to prove a conspiracy; instead, a tacit understanding among co-conspirators may be, and often will be, inferred from circumstantial evidence. In many conspiracy cases there is no confession by the defendant or other direct proof that he agreed to the illegal act. However, the jury is free to consider all the evidence—direct and indirect—presented of the defendant's statements and actions. In addition, the jury may draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence.

*United States v. Nolen*, 536 F.3d 834, 842 (8th Cir. 2008) (quoting *United States v. Winston*, 456 F.3d 861, 866 (8th Cir. 2006)).

"Among the circumstances that the courts have found probative of conspiratorial agreement are: sharing a common motive; presence in a situation where one could assume participants would not allow bystanders; repeated acts; mutual knowledge with joint action; and the giving out of misinformation to cover up." *United States v. Davis*, 810 F.2d 474, 477 (5th Cir. 1987) (citations omitted) (upholding § 241 conviction).

Here, the government produced more than sufficient circumstantial evidence to support the jury's finding of a conspiratorial agreement between Hewitt, Dooley, Pulos, and Pearce. *See id.* First, the government produced evidence of a shared motive between the officers. The evidence established that all four officers were frustrated with the decision not to punish Ramirez for his earlier altercation with a female officer. Pearce testified that he was "upset" with the decision. Trial Tr. vol. 2, at 306. Pulos described himself as "angry" and testified that "[n]obody was happy" "about the fact that Mr. Ramirez was not put in a restraint chair." Trial Tr. vol. 3, at 288, 290. Pulos testified that Dooley "was pissed that Inmate Ramirez did not go in the restraint chair, as I was." *Id.* at 301. While "[e]verybody was pretty upset about it," Pearce characterized Hewitt as being "upset the most." Trial Tr. vol. 2, at 308. Even Hewitt

testified that "[i]t's possible" that he said, "[Ramirez] should know something about putting his hand[s] on a woman." Trial Tr. vol. 4, at 141.

Second, the government produced evidence of the officers' mutual knowledge with joint action. *See Davis*, 810 F.2d at 477. Pearce testified that, after he and Hewitt saw the alleged shank in Ramirez's cell in the medical housing unit, Hewitt wanted to go back and retrieve the shank without the supervisor's involvement. Shortly thereafter, Pearce saw Hewitt talking with Pulos, Dooley, and Brown. Pearce testified that, when Brown mentioned retrieving the shank, Hewitt responded: "F**k that, Brown. We got it." Trial Tr. vol. 2, at 330. Pulos testified that he and Dooley went to remove Ramirez from his cell specifically because of the alleged shank.

Third, the government produced evidence from which a reasonable jury could conclude that the participants in the assault on Ramirez would "not likely . . . suffer the presence of unaffiliated bystanders." *United States v. Cruz-Valdez*, 773 F.2d 1541, 1547 (11th Cir. 1985). Pulos testified that, once at the holding cell, he assaulted Ramirez with Dooley and Hewitt, while Pearce acted as more of a lookout. Pulos explained that he kneed Ramirez in the back twice and then Dooley "proceed[ed] to take his turn" by punching Ramirez twice in the face. Trial Tr. vol. 3, at 311. When Hewitt entered the cell, he said, "You think that was bad, you haven't—ain't nothing happened yet." *Id.* at 312. According to Pulos, Hewitt punched Ramirez in the face and then kicked him in the back. Pearce testified that, after he arrived at the holding cell, he assaulted Ramirez with Pulos and Hewitt, while Dooley blocked the door. Specifically, Pearce testified that he looked around when he arrived, saw Ramirez "laying on the ground" in the large holding cell with Pulos and Hewitt, sent the nearby probationary officers away, and joined the others in the cell. Trial Tr. vol. 2, at 333. Pearce testified that he stepped on Ramirez's ankle, Pulos kneed Ramirez in the back, and "Hewitt picked Inmate Ramirez up by his jumpsuit and threw him against the wall." *Id.* at 343.

Fourth, the government produced evidence of a cover-up. *See Davis*, 810 F.2d at 477. Pulos testified that, when he tried to leave the cell, Hewitt warned him, "If you f***ing say anything about this, I will kill you." Trial Tr. vol. 3, at 317. Pearce testified that Hewitt and Pulos later told him that he "was next" "if [he] sa[id] anything about it." Trial Tr. vol. 2, at 350.

### 2. *Count 2*

Hewitt next argues that insufficient evidence supported his Count 2 conviction under 18 U.S.C. § 242. "To secure a conviction for deprivation of rights under color of law, the Government must prove that a defendant acted '(1) "willfully" and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States.'" *Blakeney*, 876 F.3d at 1132 (quoting *United States v. Lanier*, 520 U.S. 259, 264 (1997)).

Hewitt argues that "he did not participate in the second incident [in the holding cell] at all" and therefore cannot be guilty of the offense. Appellant's Br. at 21. Hewitt claims, as he did before the jury, that he never returned to the second floor after he and Pearce delivered medications to Ramirez. Hewitt asserts he instead went to the smoke porch after delivering Ramirez's medications. "[A]fter smoking," Hewitt maintains, "he went to get on the elevator and Lieutenant Manuel hollered at him from his office, which was right down the hall from the elevators, and asked [him] if he wanted to work C shift." *Id.* at 23. According to Hewitt, he "declined . . . and went back to the elevator to return to his station [on] the 4th floor." *Id.* To support this timeline, Hewitt relies on a log of when officers scanned badges at card readers to move through the facility on the night of the assault. When a badge is scanned, the card reader records the officer's name, number, and location. Hewitt swiped his card at 10:24:20 p.m. to access the JCDC Secured Perimeter Staff Exit. He next swiped his card 10:32:03 p.m. to access Elevator Two. Then, 23 seconds later, he swiped his card again to access Elevator Two. According to Hewitt, the first swipe is "when he went to smoke," the second swipe is when "he went to get on the elevator" but was delayed

by Lieutenant Manual, and the third swipe is when he "went back to the elevator to return to his station [on] the 4th floor." *Id.*

"It is the function of the jury, not an appellate court, to resolve conflicts in testimony or judge the credibility of witnesses. By reason of the jury's findings of guilt, the Government is entitled on appeal to the benefit of all reasonable inferences from the evidence." *United States v. Harrison*, 671 F.2d 1159, 1162 (8th Cir. 1982) (per curiam). We resolve "[a]ny conflicts in the testimony . . . in favor of the jury verdict." *Id.*

We conclude that sufficient evidence supports Hewitt's conviction on Count 2. The jury reviewed the badge log and rejected Hewitt's argument that he was not on the second floor when the assault occurred and could not have participated in it based on his badge swipes. First, the jury was entitled to find Hewitt not credible when he testified about where he took the elevator at 10:32 p.m. *See id*. Second, the government provided evidence to the jury that if there is more than one officer at any location, only one officer needs to scan his or her badge. Specifically, the JCDC's physical security and safety coordinator confirmed that "if five people were in the elevator, only one person needs to swipe." Trial Tr. vol. 2, at 82. Thus, the jury could have concluded that Hewitt went with another officer. Third, Hewitt's theory of the case was also contradicted by his coconspirators, all three of whom testified that Hewitt assaulted Ramirez in the large holding cell on the second floor. "The jury was not required to accept [Hewitt's] theory of the case or his explanation of the evidence presented against him." *United States v. Mann*, 701 F.3d 274, 299 (8th Cir. 2012).

B. *Substantive Reasonableness*

Hewitt also argues that his 45-month sentence is substantively unreasonable because the district court "improperly attributed more fault to [him] than his co-defendant Dooley" and failed to properly consider several of the 18 U.S.C. § 3553(a) factors. Appellant's Br. at 25 (emphasis omitted).

We review for an abuse of discretion the substantive reasonableness of Hewitt's sentence. *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). "A district court abuses its discretion when it (1) 'fails to consider a relevant factor that should have received significant weight'; (2) 'gives significant weight to an improper or irrelevant factor'; or (3) 'considers only the appropriate factors but in weighing those factors commits a clear error of judgment.'" *Id.* (quoting *United States v. Kane*, 552 F.3d 748, 752 (8th Cir. 2009)). "[I]t will be the unusual case when we reverse a district court's sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *Id.* at 464 (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)).

"The district judge must consider the § 3553(a) factors to determine the appropriate sentence, but does not need to mechanically recite the factors in the record." *United States v. Davenport*, 910 F.3d 1076, 1083 (8th Cir. 2018). "The district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Bridges*, 569 F.3d 374, 379 (8th Cir. 2009). "The district court has discretion to rely more heavily on some sentencing factors than others, and a defendant challenging the district court's sentence must show more than the fact that the district court disagreed with his view of what weight ought to be accorded certain sentencing factors." *United States v. Long*, 906 F.3d 720, 727 (8th Cir. 2018) (cleaned up).

Hewitt argues that the nine-month sentencing disparity between his 45-month sentence and Dooley's 36-month sentence is unwarranted. Hewitt assumes that the district court "improperly use[d] [his] involvement in the first incident against him to find him more responsible than his co-defendant Dooley, despite the fact that [Hewitt] was acquitted of these charges." Appellant's Br. at 25. The record belies Hewitt's assumption. The district court acknowledged that Hewitt "was found not

guilty of any criminal action in relation" to the first incident and expressly stated that "none of that has any impact on [the court's] sentencing considerations." Sentencing Tr. at 2–3.

The district court properly considered "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The district court explained that Hewitt's "conduct was more egregious" and his "behavior was more extreme and contributed in a more serious way to the injury that Mr. Ramirez suffered than that of Mr. Dooley." Sentencing Tr. at 15. The court found that Hewitt's "behavior was worse" and made Hewitt "more responsible for the injuries" that Ramirez sustained. *Id.* Indeed, the trial record shows it was Hewitt—not Dooley—who "picked Inmate Ramirez up by his jumpsuit and threw him against the wall." Trial Tr. vol. 2, at 343. And, afterwards, Hewitt threatened his coconspirators to cover up the assault. Hewitt's "disagree[ment] with the court's assessment" of his culpability is not "a basis for concluding that the sentence is unreasonable." *United States v. Brunken*, 581 F.3d 635, 638 (8th Cir. 2009).

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____