**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Vijay PAREKH, Defendant–Appellant.**

**No. 90–8332**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Feb. 28, 1991.

Rehearing Denied March 28, 1991.

Stephen B. Edwards, Charles D. Craig, Austin, Tex., for defendant-appellant.

Dan H. Mills, and LeRoy Morgan Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before JOHNSON, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendant Vijay Parekh stands convicted for his role in the improper efforts of a savings and loan association's officials to meet minimum net worth requirements imposed by the Federal Home Loan Bank Board (FHLBB). He asserts that insufficient evidence supports his convictions and that the prosecutor's purportedly improper comments mandate a new trial. Rejecting both of these claims, we affirm.

I.

In 1985, Lamar Savings Association (Lamar), a financial institution insured by the Federal Savings and Loan Insurance Cor-

poration, found it increasingly difficult to meet the minimum net worth requirements imposed by the FHLBB. As more of its borrowers failed to make loan payments, Lamar foreclosed on numerous real estate properties. When a financial institution such as Lamar repossesses such properties (labeled "REO," for "real estate owned"), the net worth requirement for that institution increases. The FHLBB requires an institution to increase its net worth by twenty per cent of the value of each REO on the books.

Lamar had extended a loan to Roy Moran, enabling him to construct Remington House Apartments (Remington House) in Austin. When Moran failed to make payments on his indebtedness, Lamar foreclosed, thereby increasing its net worth requirement. Because Lamar was already experiencing difficulties in meeting the FHLBB's mandates, it sought to sell Remington House and other REO properties in order to avoid regulatory intervention.

At this time, Parekh owned Excel Properties but had worked for Lamar from 1976 to 1981, rising to the title of vice-president. He and Stanley Adams, the principal owner and chairman of Lamar, had been acquainted since college in the 1950's. There is evidence in the record that Parekh indicated that he would "just do anything to help Stanley Adams out as far as purchasing other REO property that [Lamar] had."

Apparently acting on this inclination, Parekh and two others offered to buy Remington House from Lamar. Under their proposal, they would have assumed some personal liability for the loan. Lamar never responded to this offer. However, Reuben Coleman, another Lamar senior official, later contacted Parekh and asked him whether he wanted to own Remington House. Coleman instructed Parekh to fly to Houston the next day for the closing. Parekh knew neither the purchase price of the property nor the amount of the loan as he left for Houston; he found out the terms of the agreement at the closing.

Under those terms, Parekh had no personal obligation to repay the loan. According to the testimony of Merrick Leler, an-

other former Lamar employee, Coleman calculated the sales price in such a way as to avoid a loss to Lamar (which would reduce its net worth). Lamar officials credited Lamar with a one-percent origination fee for the Remington House loan transaction, further increasing its net worth. Instead of recording this amount as a deferred gain, Lamar backdated it as a current gain for the third quarter of 1985. At the closing, Phoenix Venture Group, another of Parekh's companies, received a $78,750 payment. After initially asserting that that payment related to another debt, Parekh eventually admitted that the sum was an inducement to entering into the Remington House transaction.

Parekh managed the Remington House property for less than a year. Remington House employees testified that Lamar did not participate in the daily operations of the property and that Parekh actively managed the complex. However, record evidence indicates that the accounting system in place was extremely poor. Furthermore, other witnesses contradicted the Remington House employees' testimony. When a large amount of interest came due on the loan, Parekh relinquished title to Remington House. Lamar negotiated directly with the buyer, Mounzer Hourani, without Parekh's participation. Coleman instructed Parekh to travel to Houston for the closing. Parekh did not know the identity of the buyer until he arrived. He received $331,000 from Remington House funds before relinquishing the property.

Faced with the possibility of regulatory intervention, Lamar took other steps to reduce its net worth requirement. More specifically, it made similar arrangements with Sid Terry temporarily to hold title to two other real estate properties, Stone Creek Apartments and Parklane Apartments. Parekh apparently concedes that these agreements were shams designed to get REO property off of Lamar's books.

## II.

A grand jury issued a four-count indictment accusing Parekh of a variety of offenses for his involvement in Lamar's

scheme to reduce artificially its net worth requirement. Count one charged Parekh with conspiracy under 18 U.S.C. § 371, alleging that Parekh and others conspired (1) to misapply the funds of a savings and loan association in violation of 18 U.S.C. § 657; (2) to make false entries into the records of a savings and loan in violation of 18 U.S.C. § 1006; and (3) to make false statements to the FHLBB in violation of 18 U.S.C. § 1001. Counts two, three, and four accused Parekh of aiding and abetting others in their violations of the same three statutory provisions, respectively, in violation of 18 U.S.C. § 2. A jury convicted Parekh on all counts.

### III.

Parekh alleges that the evidence does not sufficiently support either the conspiracy or aiding and abetting convictions. A defendant seeking reversal of his convictions on sufficiency of the evidence grounds faces an imposing standard of review:

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979) (footnote omitted). The Court continued, "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* at 318–19, 99 S.Ct. at 2788–89 (quoting *Woodby v. INS,* 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966) (emphasis added)).[1] Because we conclude that a reasonable trier of fact could have found Parekh guilty beyond a reasonable doubt, we affirm the convictions.

■ The indictment charged Parekh with conspiring[2] with others to (1) misapply Lamar's funds[3]; (2) make false entries in Lamar's records[4]; and (3) make false

1. In his brief, Parekh offers a slightly different articulation of the standard of review, stating that "[t]he Court of Appeals should reverse a conviction based on factual insufficiency of the evidence only if a reasonably minded jury necessarily must have entertained a reasonable doubt of the Defendant's guilt" (citing *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)); *United States v. Vergara,* 687 F.2d 57, 60 (5th Cir.1982). There is no substantive difference between these two articulations of the standard of review. The phrasing quoted in the text implies that the conviction should be affirmed even if *some* rational triers of fact might not have found the elements of the offense beyond a reasonable doubt. In other words, it is not necessary that *all* rational triers of fact would have found the elements of the offense. The *Vergara* phrasing implies that we reverse a conviction only if *all* reasonably minded juries would not have found all the elements of the offense beyond a reasonable doubt. *Vergara* does not stand for the proposition that we must reverse if *any* reasonable trier of fact would have entertained a reasonable doubt of the defendant's guilt. *Vergara* presents simply a different way of saying the same thing, i.e., that we will affirm a conviction if a rational trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.

2. Section 371 provides in part,

If two or more persons conspire either to commit any offense against the United States,

or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. Section 657 provides,

Whoever, being an officer, agent or employee of or connected in any capacity with ... [a] savings and loan corporation or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution ... shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both....

4. Section 1006 provides,

Whoever, being an officer, agent or employee of or connected in any capacity with ... [a] savings and loan corporation or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution or of department [sic] or agency of the

statements to the FHLBB.[5] To establish that Parekh is guilty of conspiracy, the government was required to prove the following elements beyond a reasonable doubt: "(1) that two or more people agreed to pursue an unlawful objective together; (2) that the defendant voluntarily agreed to join the conspiracy; and (3) that one of the members of the conspiracy performed an overt act to further the objectives of the conspiracy." *United States v. Tullos,* 868 F.2d 689, 693 (5th Cir.) (citing *United States v. Davis,* 810 F.2d 474, 476–77 (5th Cir.1987)), *cert. denied,* 490 U.S. 1112, 109 S.Ct. 3171, 104 L.Ed.2d 1033 (1989).

■ The indictment also charged Parekh with aiding and abetting the commission of the three offenses listed above.[6] To convict a defendant for aiding and abetting the commission of a crime, the government must prove that the defendant " 'associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed.' " *United States v. Manotas–Mejia,* 824 F.2d 360, 367 (5th Cir.) (quoting *United States v. Holcomb,* 797 F.2d 1320, 1328 (5th Cir.1986)), *cert. denied,* 484 U.S. 957, 108 S.Ct. 354, 98 L.Ed.2d 379 (1987).

■ Parekh correctly observes that the propriety of these convictions depends upon whether there was evidence sufficient to permit a rational jury to conclude that Lamar's loan to him was a "sham." We conclude that the government did present sufficient evidence.

Parekh's utter lack of knowledge of the terms of either the initial sale to him of Remington House or the subsequent sale to Hourani provided the jury a basis for determining that the sale and accompanying loan were designed for the sole purpose of artificially reducing Lamar's net worth requirements. Parekh's stated desire to help Adams remove REO property from Lamar's books adds credence to that conclusion.

Lamar officials' references to their arrangement with Parekh as a "temporary deal" or "temporary fix" further supports an inference that the loan was a sham, as does Parekh's statement to Charles Cheaney (one of Hourani's employees) that Parekh was merely a "caretaker" for Remington House. Phoenix Venture Group's receipt of $78,750 at the first closing also constitutes evidence that the loan to Parekh was less than legitimate; Parekh's contradictory statements concerning the money he received corroborates that inference. Lamar's similar treatment of the Stone Creek and Parklane properties provided the jury with an additional foundation for its conclusion.

■ Evidence tending to show that the loan was legitimate is insufficient to require a reversal. Under the governing standard of review, we must view the evidence in the light most favorable to the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). More specifically, the fact that Parekh may have participated actively in the management of Remington House does not render unreasonable the jury's conclusion that the loan nonetheless was a sham.

Citing *United States v. Gens,* 493 F.2d 216 (1st Cir.1974), Parekh further argues that the fact that he had the financial ability to repay the loan is conclusive proof that the loan was not a sham. *Gens* does not support this proposition. In discussing the meaning of the term "misapplication," the

United States, makes any false entry in any book, report or statement of or to any such institution ... shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.

**5.** Section 1001 provides,
  Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false,

fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**6.** Section 2 provides in part,
  Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

court identified three types of cases in which a third party, rather than the named debtor, is responsible for the debt.[7] After listing those three, the court concluded, "[i]n the three situations described above, the loans formally being made could be characterized as 'sham' or 'dummy' loans, because there was little likelihood or expectation that the named debtor would repay." *Id.* at 222.

Parekh incorrectly derives from this language the proposition that because he possessed the financial ability to repay the loan, the loan was not a sham. The *Gens* court does not speak solely in terms of financial ability to repay the loan; it instead focuses upon the "likelihood or expectation" that the debtor would repay the loan. A debtor's inability to repay the loan constitutes *one* of the reasons he might not be expected to repay. If it were the *sole* reason, as Parekh seems to contend, then his corollary inference that his financial ability to repay rendered the loan legitimate would be correct. However, it is not the sole reason: Under the *Gens* articulation, a loan is a sham if "there was little likelihood or expectation that the named debtor would repay." That conclusion accurately describes the instant case: The evidence plainly indicates that no one ex-

pected Parekh to make payments on the Remington House loan.[8]

Parekh also asserts that "[t]he Government has wholly failed to show an intent to injure or defraud Lamar Savings, necessary for a 18 U.S.C. Section 656 [sic] conviction." Parekh correctly states that an intent to injure or defraud the institution is an element of the section 657 crime. *See United States v. Stovall*, 825 F.2d 817, 823 (5th Cir.), *modified*, 833 F.2d 526 (5th Cir. 1987) (per curiam).

■ However, insofar as Parekh suggests that the government was required to show that Parekh himself intended to injure or defraud Lamar, he is incorrect.[9] The indictment charged him with aiding and abetting misapplication, not with misapplication itself. To prove up accomplice liability, the government needed only to demonstrate that the defendant " 'associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed.' " *Manotas–Mejia*, 824 F.2d at 367 (quoting *Holcomb*, 797 F.2d at 1328); *see also* W. LaFave & A. Scott, *Criminal Law* § 6.7, at 576 (2d ed. 1986).[10]

At the same time, the government is not relieved of its obligation to provide suffi-

---

**7.** The court identified these as follows: (1) "those in which bank officials knew the named debtor was either fictitious or wholly unaware that his name was being used"; (2) "cases in which bank officials knew the named debtor was financially incapable of repaying the loan whose proceeds he passed on to the third party"; and (3) "cases in which bank officials assured the named debtor, regardless of his financial capabilities, that they would look for repayment only to the third party who actually received the loan proceeds." 493 F.2d at 221–22.

**8.** *Gens* further states, "[W]here the named debtor is *both* financially capable *and* fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy...." *Id.* at 222 (emphasis added). A debtor's financial ability to repay the note is thus necessary but not sufficient to render a loan legitimate.

**9.** By differentiating between the respective requisite intents of the accomplice and the principal, we do not mean to undermine those cases

stating that the accomplice must "share[ ] in the criminal intent of the principal." *See, e.g., United States v. Colwell*, 764 F.2d 1070, 1072 (5th Cir.1985) ("shared in the criminal intent of the principal"); *United States v. Westbo*, 746 F.2d 1022, 1025 (5th Cir.1984) (per curiam) ("sharing in the requisite intent"); *United States v. Bright*, 630 F.2d 804, 813 (5th Cir.1980) ("community of unlawful intent"). Those cases are simply different articulations of the usual requirement that the defendant " 'associated with a criminal venture ... and sought by his action to make the venture succeed.' " *Manotas–Mejia*, 824 F.2d at 367 (citation omitted). They do not compel us to conclude that the government needed to prove that Parekh intended to injure or defraud Lamar.

**10.** For these reasons, Parekh's complaint on appeal that he did not "participate[ ] in any meetings where 'getting the REO's off the books' was discussed, where officials of Lamar discussed 'temporary fixes,' or where the rebooking of the deferred gain to current gain was discussed" is to no avail. The government did not need to prove such things to secure an aiding and abetting (or conspiracy) conviction.

cient evidence of the principal's guilt. *United States v. Blankenship*, 746 F.2d 233, 240 (5th Cir.1984) (per curiam); *Smith v. Estelle*, 569 F.2d 944, 945 (5th Cir.1978); W. LaFave & A. Scott, *supra*, § 6.8(c), at 592 ("the guilt of the principal must be established at the trial of the accomplice as a part of the proof on the charge against the accomplice").[11] The critical question, then, is whether the government presented enough evidence from which a rational jury could infer that a principal intended to injure or defraud Lamar in making the sham loan to Parekh.

In *United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990), we held that "[s]uch intent 'is proven by showing a knowing, voluntary act by the defendant, the natural tendency of which may have been to injure the bank even though such may not have been his motive.'" *Id.* at 215 (quoting *United States v. Southers*, 583 F.2d 1302, 1305 (5th Cir.1978)).[12] We conclude that the sham loan to Parekh would naturally tend to injure Lamar and thus that the government provided enough evidence of a principal's guilt.

First, exposing Lamar and its officials to potential governmental sanction for the circumvention of regulatory requirements is in itself a harm. Second, the regulatory requirements are designed to promote the healthy operation of a financial institution; avoidance of these regulations accordingly poses a potential harm to it. Third, utilization of funds for the sham loan prevented their use for profitable lending. *See Hopkins*, 916 F.2d at 215 ("the misapplication of funds reduced the amount of money available for lawful investment").

In short, we reject Parekh's attacks on the sufficiency of the evidence. First, the propriety of the convictions rests primarily upon the legitimacy of the Remington House loan, and we conclude that there was enough evidence from which a rational jury could conclude that the loan was a sham. Second, Parekh's alleged financial ability to repay the loan does not preclude a finding of guilt. Third, the government provided sufficient evidence of the principal's state of mind, thus allowing conviction of the accomplice, Parekh.

## IV.

During his closing argument, the prosecutor, recalling the presence of Stanley Adams's lawyer in the courtroom, suggested that "the conspiracy continues right up to this day." Parekh did not object to this comment at the time but now asserts that it is plain error meriting reversal. We disagree.

As we said in *United States v. Iredia*, 866 F.2d 114 (5th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989), "[t]he determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id.* at 117 (citing *United States v. Jones*, 839 F.2d 1041, 1049 (5th Cir.), *cert. denied*, 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988)). Assuming, without deciding, that the prosecutor's comments were improper, we cannot say that such remarks "cast serious doubt on the correctness of the jury's verdict."

Another test of whether an error is plain centers upon whether a cautionary instruction could have cured it. *United States v. Davis*, 831 F.2d 63, 66 (5th Cir. 1987). In the instant case, Parekh's coun-

---

**11.** To our knowledge, the government has not tried any of the possible principals upon whose conduct Parekh's accomplice liability rests. This fact, however, does not undermine the government's case against him. "[I]t is now generally accepted that an accomplice may be convicted notwithstanding the fact that the principal in the first degree has been acquitted or has not yet been tried." W. LaFave & A. Scott, *supra*, § 6.8(c), at 592; *see also Standefer v. United States*, 447 U.S. 10, 19, 100 S.Ct. 1999, 2005, 64 L.Ed.2d 689 (1980).

**12.** *See also United States v. Levy*, 741 F.2d 915, 921–22 (7th Cir.) ("An actual desire to inflict harm on the bank is not required."), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984); *United States v. Krepps*, 605 F.2d 101, 104 (3d Cir.1979); *United States v. Larson*, 581 F.2d 664, 667 (7th Cir.1978); *United States v. Killian*, 541 F.2d 1156, 1159–60 (5th Cir.1976); *United States v. Schmidt*, 471 F.2d 385, 386 (3d Cir.1972) (per curiam).

sel did not object to the prosecutor's comment, and thus the court did not have an opportunity to render a curative instruction. However, the court did instruct the jury that comments of the lawyers during closing argument are not evidence. We have held that this particular instruction can cure certain prejudicial statements that might be made during closing argument. *See, e.g., United States v. Livingston*, 816 F.2d 184, 196 (5th Cir.1987). As the allegedly improper comment in this case is just such a statement, we will not order a new trial.

AFFIRMED.