REVISED, July 29, 1998

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

—————————

No. 96-20908

—————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

KENNETH LEE SCHNITZER, SR.,
PHILIP J. BARBER, and
WALTER M. ROSS,

Defendants-Appellees.

—————————————————

Appeals from the United States District Court
for the Southern District of Texas

—————————————————

July 2, 1998

Before REAVLEY, JONES, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

On July 20, 1995, a federal grand jury returned a four-count indictment against Kenneth Lee Schnitzer, Sr., Philip J. Barber, and Walter M. Ross. These three defendants were directors of the BancPLUS Savings Association, a federally insured financial institution operating in Texas. The charges in the indictment stemmed from a two-part real estate transaction negotiated and approved, in large part, by the defendants, whereby California-Texas Properties, Inc. (Cal-Tex), agreed to buy land owned by BancPLUS in exchange for BancPLUS's agreement to purchase land from Scott's Cattle Company (Scott's Cattle).

At trial, the government advanced several theories for why the events surrounding this transaction and its accounting subjected the defendants to criminal liability. Convinced by the government's myriad attacks on the propriety of the conditional sales, the jury convicted the defendants of misapplying BancPLUS funds, making a false entry in BancPLUS records, devising or

attempting to devise a scheme and artifice to defraud BancPLUS, and conspiring to commit at least one of these three substantive offenses.

The district court, however, directed a judgment of acquittal for each defendant on each count, and in the alternative, granted each defendant's request for a new trial on all counts. On appeal, the government challenges both of these decisions by the district court. With respect to the false entry count, we hold that the government produced sufficient evidence in support of its permissible theory of false entry but also placed evidence of a legally impermissible theory of false entry before the jury. We therefore reverse the district court's decision to acquit the defendants on the false entry count, but affirm its decision to grant the defendants a new trial on this count and the related conspiracy charge. For the reasons discussed below, we affirm the district court's decision to acquit each defendant on the misapplication of funds and bank fraud counts. The defendants are also entitled to acquittals on the conspiracy charges related to these two substantive offenses.

## I. Factual Background

In order for the defendants to be acquitted on the basis of insufficient evidence, the evidence viewed in the light most favorable to the verdict must demonstrate that a rational trier of fact could not have found the essential elements of the alleged crimes beyond a reasonable doubt. *See United States v. Beuttenmuller*, 29 F.3d 973, 978 (5th Cir. 1994). Accordingly, we set forth the facts in the light most favorable to the jury's determination that the defendants were guilty of the crimes charged in the indictment.

In May 1985, BancPLUS owned land in the Houston area that was causing it substantial losses. In order to improve its financial performance, BancPLUS decided to sell the Houston property and employed James Rash and Neil Freese to locate a purchaser. Rash and Freese eventually contacted Hal Pettigrew, a land speculator who expressed interest in buying the Houston property for the stated price of $46 million. Pettigrew, however, indicated that his willingness to purchase the Houston property was conditioned on BancPLUS's agreement to buy a tract of property in return.

2

After considering several pieces of property in Pettigrew's portfolio, Rash and Freese expressed interest in 200 acres of undeveloped land in the Dallas area. Although the Dallas property was featured in Pettigrew's portfolio, he was not the owner. Once it became clear that BancPLUS was interested in the Dallas property, however, Pettigrew paid the owner of the land—Lintex Land—$150,000 in earnest money toward his acquisition of the Dallas property.

On May 28, 1986, Schnitzer, Barber, Freese, Rash, Ross, and Pettigrew toured the Dallas property by helicopter. Immediately after the tour, the defendants met with Pettigrew to discuss the proposed conditional sale. During this meeting, Pettigrew stated that the asking price for the Dallas property was $26 million.

To determine if that price was reasonable, BancPLUS spoke to developers of adjacent property about the development potential of the Dallas property, hired an engineering firm to investigate utility and flood plain issues, and investigated zoning and other issues regarding future development. As a result of this investigation, BancPLUS concluded that the property was a desirable investment, in part because it was located near both the Dallas-Fort Worth airport and a planned interstate highway and was zoned for a mix of commercial and residential development. The defendants also believed that BancPLUS would benefit from owning the Dallas property rather than the Houston property because the Dallas real estate market was faring better than its Houston counterpart.

To complete its due diligence, BancPLUS obtained an appraisal of the Dallas property from an experienced and accredited appraiser, Robert Brandt. This appraisal indicated that the property was worth $35 million. Although Pettigrew paid for this appraisal and Brandt was not listed in BancPLUS's records as an approved appraiser, Brandt had appraised the property for others and had consistently valued it at $35-36 million.

After BancPLUS determined that Pettigrew had the financial ability to make a 20% down payment on the Houston property from his personal funds and was a creditworthy borrower, Rash and Freese negotiated the conditional sale with Pettigrew. Pettigrew, through his Cal-Tex

3

corporation, agreed to purchase the Houston property for $46 million with a $9 million down payment. In return, BancPLUS, through a subsidiary, agreed to purchase the Dallas property from Scott's Cattle for $26 million with a $15 million down payment. Pettigrew was the sole representative of Scott's Cattle during these negotiations.

In reality, however, Scott's Cattle was Pettigrew's representative in the sale of the Dallas property. Before closing, Scott's Cattle, a corporation previously created by Pettigrew's lawyer, Ray Williamson, agreed to act as Cal-Tex's (and thus ultimately Pettigrew's) agent in the purchase and resale of the Dallas property. In addition, Scott's Cattle obtained Pettigrew's purchase rights in the Dallas property by assignment. This agency or nominee relationship between Scott's Cattle and Pettigrew was never formally disclosed to BancPLUS or any of its representatives. Nevertheless, Williamson once asked Pettigrew why he needed Scott's Cattle to act as his nominee in the sale of the Dallas property and Pettigrew responded by stating: "They tell me I need one." At trial, Williamson testified that he believed Pettigrew was referring to BancPLUS when he made this statement.

As the closing neared, those responsible for handling various aspects of the transaction for BancPLUS began asking questions about Pettigrew's involvement in the sale of the Dallas property. For example, Bruce Merwin, the lawyer in charge of simultaneously closing both transactions for BancPLUS, questioned BancPLUS officials, including defendants Ross and Barber, about whether "Pettigrew or Scott Cattle Company [should] be designated as the [s]eller" of the Dallas property. He also sent Ross and Barber a memorandum stating that the $26 million asking price was "approximately $6 million in excess of fair market value." In addition, Eric Schumann, an accountant at BancPLUS, and Peter Hensley, the BancPLUS director responsible for overseeing the accounting for these transactions, also asked Ross and Barber whether Pettigrew was the seller of the Dallas land. Ross responded to these inquiries by stating that Pettigrew was not the seller of the Dallas property and by discouraging additional queries about Pettigrew's relationship to Scott's Cattle.

On June 13th, Scott's Cattle purchased the Dallas land from Lintex Land for $13 million.

4

Three days later, the sale of the Houston property by BancPLUS to Cal-Tex for $46 million and the purchase of the Dallas property by BancPLUS from Scott's Cattle for $26 million closed simultaneously. At the closing, Pettigrew provided BancPLUS with an affidavit that stated: "I am not an officer, director, or shareholder of Scott's Cattle Company. Additionally, there are no agreements or understandings under which I have a right to become an officer, director, or shareholder in Scott's Cattle Company." Thus, Pettigrew's affidavit, while true, did not rule out his participation in other legal arrangements giving him a financial interest in the sale of the Dallas property.

The BancPLUS records relating to the conditional sales were then placed in closing binders. Although these binders did not reveal that Pettigrew was the seller of the Dallas property, they did contain documents tracing BancPLUS's circular funding of Cal-Tex's down payment on the Houston property. The payment instructions in these binders indicated that the $15 million down payment by BancPLUS was wired to Texas National Title, a company owned, like BancPLUS, by Century Corporation. Texas National Title in turn wired the down payment to an account for Scott's Cattle at Texas Commerce Bank. Scott's Cattle then immediately wired $9 million of this $15 million deposit to a Cal-Tex account at Texas Commerce Bank. Finally, this $9 million was then wired back to Texas National Title, which in turn wired the money to BancPLUS as the Cal-Tex down payment on the Houston property.

The documents in the closing binders also revealed that Scott's Cattle had purchased the Dallas property and then immediately sold it to BancPLUS. These records did not, however, reveal that Scott's Cattle had purchased the Dallas property for $13 million. Further, although this sale price was listed in records located at Texas National Title, it was not a matter of public record.

After these transactions closed, the financial condition of BancPLUS appeared to be significantly improved. BancPLUS had reduced its exposure on its real estate holdings and had replaced burdensome property with potentially profitable property in a better real estate market. Moreover, because BancPLUS's accountants believed that Pettigrew was not the seller of the Dallas

property based on Ross's statements and Pettigrew's affidavit, they recorded a profit from the sale of the Houston property. Thus, from an accounting point of view, the sale of the Houston property had generated a profit that made BancPLUS profitable for the first time in its history.

By mid-1987, however, BancPLUS's financial outlook had dimmed considerably. Cal-Tex defaulted on its loan for the Houston property, and BancPLUS was forced to foreclose on the land. As a result, the profit that BancPLUS had recorded on the sale could not be realized. Examiners from the Federal Home Loan Bank Board (FHLBB), moreover, were conducting a yearly audit of BancPLUS at this time. Based on their review of the circular funding instructions and the Pettigrew affidavit, the auditors suspected that Pettigrew was involved in the sale of the Dallas property and that BancPLUS had improperly accounted for the conditional sales under Financial Accounting Standards Board (FASB) 66. After the defendants arranged for the examiners to review records held by Texas National Title, the examiners determined that Pettigrew was the seller of the Dallas property, that a profit could not be booked on the related transactions, and that the profit recorded by BancPLUS would have to be reversed.

The events unfolding at BancPLUS eventually attracted the attention of the Resolution Trust Corporation (RTC). During his discussions with the RTC, Barber stated that he knew Pettigrew "had to have something to do with" the sale of the Dallas property, but that he believed the sale of the Houston property and the purchase of the Dallas property were separate from an "accounting standpoint."

## II. Procedural History

The investigations by federal banking regulators led to the convening of a grand jury. In an effort to fend off criminal charges, Schnitzer elected to testify. Although he did not admit that he knew Pettigrew was the seller of the Dallas property, Schnitzer testified that he, like Barber, had been "suspicious" of Pettigrew's role in the sale of that property.[1] Schnitzer's testimony, however, did not

_____

[1] This testimony was admitted into evidence at trial.

have the desired effect, for the grand jury indicted the defendants.

At trial, the government presented numerous and shifting theories of why the defendants should be found criminally liable for their roles in negotiating, approving, and accounting for the sale of the Houston property and the purchase of the Dallas property. The defendants rested at the close of the government's case and together moved for a judgment of acquittal on all counts. The district court denied this motion, and the jury then convicted the defendants on the four counts contained in the indictment.

After the verdict, the defendants renewed their joint motion for judgment of acquittal and, in the alternative, moved for a new trial. The district court granted this motion and acquitted each defendant on all charges because of insufficient evidence. With respect to the false entry count, the district court stated that the validity of the conviction turned on "whether the government has shown beyond a reasonable doubt that [the] defendants knew of the falsity of Pettigrew's affidavit and of his involvement with Scott's [Cattle]." Because the district court found that the government failed to prove beyond a reasonable doubt that the defendants knew that Pettigrew was the seller of the Dallas property, it granted each defendant an acquittal on the false entry count. With respect to the misapplication of funds and bank fraud counts, the district court concluded that the government's evidence failed to show beyond a reasonable doubt that the sale of the Houston property in exchange for the purchase of the Dallas property was a sham as the indictment charged. Instead, the district court believed the evidence before the jury demonstrated that these conditional sales constituted "a legitimate value-for-value transaction." In the alternative, the district court also ordered a new trial on all counts. The district court justified this decision on the grounds that the verdict, even if supported by sufficient evidence, was nevertheless against the great weight of the evidence and that the government placed undue emphasis on an erroneous understanding of the relevant accounting regulations governing the savings and loan industry in 1986.

### III. Discussion

#### A. False Entry

7

To establish a false entry in violation of 18 U.S.C. § 1006,[2] the government must prove: 1) that BancPLUS was a lending institution authorized by and acting under the laws of the United States; 2) that the defendants were officers, agents, or employees of BancPLUS; 3) that the defendants knowingly and willfully made, or caused to be made, a false entry concerning a material fact in a BancPLUS book, report, or statement; and 4) that the defendants acted with the intent to injure or defraud BancPLUS or any of its officers, auditors, examiners, or agents. *United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995); *see also United States v. Shunk*, 113 F.3d 31, 34 (5th Cir. 1997) (holding that materiality is an element of a § 1006 offense notwithstanding the Supreme Court's decision in *United States v. Wells*, 117 S. Ct. 921 (1997), which held that materiality is not an element of an 18 U.S.C. § 1014 offense).

The defendants contend that the government failed to prove that BancPLUS's records contained a false statement either because these records accurately reflected all of the information known by the defendants or because the recognition of profits on the sale of the Houston property was consistent with federal banking regulations. In addition, the defendants assert that even if BancPLUS's records contained a false statement, they did not cause this entry to be made. Finally, the defendants claim that absent proof of causation, there is no basis for finding that they acted with the requisite intent.

In response, the government first contends that either the recognition of profits from the sale of the Houston property, in violation of BancPLUS accounting policies, or the omission from the

---

[2]     This statute provides, in pertinent part:

> Whoever, being an officer, agent, or employee of . . . any lending [institution] . . . authorized or acting under the laws of the United States, or any institution . . . the accounts of which are insured by the Federal Deposit Insurance Corporation, . . . with the intent to defraud any such institution . . . , or to deceive any officer, auditor, examiner, or agent of any such institution or of [any] department or agency of the United States, makes any false entry in any book, report, or statement of or to any such institution . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1006.

8

closing binders of Pettigrew's financial interest in the Dallas Property, constituted the false entry of material fact. *See Parks*, 68 F.3d at 865 (stating that a "false entry can be . . . an omission of material information").[3] The government maintains that the defendants caused this false entry by failing to disclose to BancPLUS's accountants that Pettigrew was the seller of the Dallas property. To complete its first theory of false entry, the government asserts that the defendants purposely withheld this information to deceive federal bank examiners as to the profitability of BancPLUS because they knew that BancPLUS's accountants would not book an immediate profit on the sale of the Houston property if told of Pettigrew's true role in the sale of the Dallas property.

To prove this theory of false entry, the government introduced evidence that the defendants knew that Pettigrew was the seller of the Dallas property. To begin with, the government's witnesses testified that the defendants knew that Pettigrew had conditioned his purchase of the Houston property (through Cal-Tex) on BancPLUS's agreement to purchase a parcel of property in return. In addition, the government demonstrated that the defendants negotiated solely with Pettigrew regarding BancPLUS's purchase of the Dallas property. Based on these facts alone, Barber and Schnitzer admitted that they suspected that Pettigrew was the seller of the Dallas property, and Schumann and Hensley told the defendants that Pettigrew could be viewed as the seller of the Dallas property. Further, based on his review of the closing documents, Merwin asked Ross and Barber if BancPLUS was purchasing the Dallas property from Pettigrew. In light of this evidence, the jury could have reasonably concluded that the defendants were more than suspicious of Pettigrew's role in the sale of the Dallas property and in fact knew, based on the structure of the transaction, Pettigrew's overarching involvement in the negotiations, and the questions raised by those reviewing the transaction for BancPLUS, that Pettigrew was the seller of that property.

---

[3] The indictment in this case specified that the omission of Pettigrew's financial interest in the sale of the Dallas property constituted the false entry. This omission and the resulting false statement of profits are merely flip sides of the same coin. Accordingly, our analysis of the government's proof of causation and intent under its first theory of false entry applies equally to either articulation of the false entry.

9

Contrary to the defendants' suggestion, the affidavit provided by Pettigrew does not preclude a finding that Pettigrew was the seller of the Dallas property. Although the affidavit could reasonably be viewed as allaying the defendants' suspicions that Pettigrew was affiliated with Scott's Cattle as an officer, director, or shareholder, a jury could also reasonably conclude that this affidavit was itself suspicious because it did not rule out other legal arrangements whereby Scott's Cattle could operate as Pettigrew's nominee. Further, Williamson testified that Pettigrew stated that he was instructed to obtain a nominee for the sale of the Dallas property. The jury, like Williamson, could infer that it was the defendants, with whom Pettigrew had been negotiating, who instructed him to obtain a nominee. Thus, when considering all the evidence, a reasonable juror could conclude that the defendants knew that Pettigrew was the seller of the Dallas property.[4]

The evidence also supported the jury's finding that the defendants' failure to inform BancPLUS's accountants that Pettigrew was the seller of the Dallas property caused the accountants to record falsely a profit on the sale of the Houston property. Each BancPLUS accountant responsible for recording these transactions testified that he would not have recorded an immediate profit on the sale of the Houston property had he known that Pettigrew was the seller of the Dallas property. Thus, the government adequately proved that the defendants' concealment of Pettigrew's role in the sale of the Dallas property caused BancPLUS's accountants to record a profit that was false under BancPLUS's accounting policies. That this false statement of profits caused by the defendants' omission of Pettigrew's financial interest in the sale of the Dallas property "had the capacity to impair or pervert the functioning of" BancPLUS is not in dispute. Accordingly, the false entry was material, *see Parks*, 68 F.3d at 865, and the government's proof of the third element of

_____

[4] The defendants also contend that the evidence did not support an instruction on deliberate ignorance and that they are therefore entitled to a new trial. We disagree. As the government notes, there was evidence that would allow a jury to conclude that the defendants in fact knew that Pettigrew was the seller of the Dallas property or that the defendants deliberately avoided learning that Pettigrew was the seller by refusing to determine if Scott's Cattle was his nominee or agent when confronted with the questioning by Schumann, Hensley, and Merwin and the obviously incomplete affidavit. Under these circumstances, a deliberate ignorance instruction was not improper. *See United States v. Chen*, 913 F.2d 183, 192 (5th Cir. 1990).

10

false entry was sufficient.

Finally, there was sufficient evidence to support a finding that the defendants acted with the intent to deceive federal regulators when causing the false statement of profits by concealing Pettigrew's actual involvement in the transaction. The jury could have reasonably concluded that given BancPLUS's history of losing money, the appearance of profitability was necessary to stave off federal supervision of BancPLUS's operations or to obtain federal approval for certain transactions that the defendants were interested in pursuing. Therefore, under the government's first theory of false entry and conspiracy to commit false entry, there was sufficient evidence to sustain each defendant's conviction because the government adequately proved each element of these offenses.[5]

Had this been the only theory of false entry before the jury, then we would reinstate each defendant's conviction on this count and its conspiracy analog. But the government also argued that the booking of a profit on the sale of the Houston property constituted a false entry because the federal banking regulations in effect in 1986, which the government believed incorporated FASB 66, precluded a bank from recording a profit on the sale of real property when it financed the purchaser's down payment on that property. Consistent with this understanding of the relevant regulations, the government also tried the false entry count on the alternate theory that the defendants caused the violation of FASB 66 and the resulting false entry by concealing evidence of the circular funding of the Cal-Tex down payment on the Houston property from BancPLUS's accountants. The government maintained that the defendants withheld this information from the accountants in order to deceive regulators as to the profitability of BancPLUS because the defendants knew that the accountants would not record a profit on the transaction under FASB 66 if this information were revealed. Thus, the government contends that the evidence regarding the violation of FASB 66 was relevant because it demonstrated that the recognition of profits from the sale of the Houston property

---

[5] The defendants do not contest that the evidence of a conspiracy was sufficient. Instead, they argue that they agreed to pursue, and acted in furtherance of, a lawful business objective.

constituted a false entry and that the defendants concealed the circular funding from the accountants with the intent to deceive federal examiners.

The district court, however, correctly recognized that this second theory of false entry should not have been before the jury. To begin with, the government's position that BancPLUS's immediate recognition of profits violated federal banking regulations is foreclosed by our precedent. In *United States v. Baker*, we reviewed the "Regulatory Accounting Principles (RAP)" in effect in 1986 and determined that under these regulations, a bank could sell its real estate holdings, "finance[] 100% of [a purchaser's] loan[], and book[] a profit at the inception of the loan." 61 F.3d 317, 321 (5th Cir. 1995). Accordingly, the government's second theory of false entry is "contrary to law" because it is "'based on an erroneous view'" of the applicable federal regulations. *See Griffin v. United States*, 112 S. Ct. 466, 474 (1991) (quoting *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991)).

In addition, the evidence regarding the alleged violation of FASB 66 was also inadmissible because it was not introduced for the permissible purpose of showing the defendants' intent to deceive federal regulators. *See United States v. Cordell*, 912 F.2d 769, 775 (5th Cir. 1990) (holding that evidence of violations of civil banking regulations may be introduced for the limited purpose of establishing a defendant's motive or criminal intent); *United States v. Christo*, 614 F.2d 486, 490-92 (5th Cir. 1980) (holding that the government may not prove a criminal violation of federal banking law solely by proving a violation of a civil banking regulation). In order for this alleged violation to be probative of the defendants' intent to deceive federal regulators as to BancPLUS's profitability, the government needed to demonstrate that the defendants concealed the circular funding from BancPLUS's accountants because they knew that these accountants would interpret FASB 66 to preclude the recognition of an immediate profit on the sale of the Houston property. The government, however, failed to show that the defendants concealed the circular funding from BancPLUS's accountants, for the closing binders given to the accountants revealed that BancPLUS had funded the Cal-Tex down payment on the Houston property. More importantly, Hensley, the

12

BancPLUS director in charge of accounting for the sale of the Houston property, unequivocally testified that he would have booked a profit on the sale of the Houston property even if the defendants had explicitly told him of the circular funding, notwithstanding the government's contention that this accounting treatment would have violated FASB 66. The evidence regarding the alleged regulatory violation, therefore, was not probative of the defendants' intent to deceive federal regulators as to BancPLUS's profitability. Accordingly, the government's evidence regarding FASB 66 should have been excluded.

The admission of this evidence, moreover, created the risk that its exclusion was designed to avoid. As a result of the government's failure to connect the evidence regarding FASB 66 to the defendant's intent to deceive federal banking regulators, the jury was left only with Carlton's testimony that the booking of a profit on the sale of the Houston property constituted a false entry because it purportedly violated FASB 66. The government, however, elicited this testimony *after* Hensley, another government witness, had already testified that the disclosure of the circular funding would not have precluded BancPLUS from recording a profit on the sale of the Houston property. Even more troubling is the fact that the government closed by telling the jury: "Now, if we're just going to ignore the regulations and the way the institutions are run, then we might as well give bankers a shoe box and let them just keep the money in it." These events indicate that the government "improperly focus[ed] the jury's attention to the prohibitions of" FASB 66 rather than the elements of a § 1006 violation and thus "impermissibly infected the very purpose for which the trial was being conducted." *Christo*, 614 F.2d at 492. Thus, by not excluding evidence of the alleged regulatory violation, the district court opened the door for the government's legally impermissible "attempt to bootstrap a . . . civil regulatory violation into [a] . . . felon[y]." *Id.* at 492.

The risk of a legally unsound false entry conviction was further heightened by the district court's failure to close the door on the government's second theory of false entry before submitting the case to the jury. By instructing the jury that the evidence of the violation of FASB 66 could not by itself support a conviction and was relevant, if at all, only as evidence of the defendants' intent,

13

the district court could have minimized the potential impact of this irrelevant evidence. *See, e.g.*, *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir. 1993); *Cordell*, 912 F.2d at 775. The district court, however, refused the defendants' request for this limiting instruction. Further, by instructing the jury to disregard the evidence relating to FASB 66 in its entirety because of its irrelevance under the government's permissible and supported theory of false entry, the district court could have perhaps eliminated any possible prejudice to the defendants. *See Griffin*, 112 S. Ct. at 474; *Christo*, 614 F.2d at 492. The district court, however, also failed to take this step.

To its credit, the district court later recognized the troubling implications of its evidentiary rulings and the government's alternate theory of false entry and granted a new trial on this count. Under these circumstances, we hold that the district court did not clearly abuse its discretion in taking this action "in the interests of justice." Fed. R. Crim. P. 33; *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997) (noting that a district court's decision to grant a new trial is reviewed for a clear abuse of discretion). We therefore remand for a new trial on the government's permissible theory of false entry and the related conspiracy charge.

### B. Misapplication of Funds

To establish a misapplication of BancPLUS funds in violation of 18 U.S.C. § 657,[6] the government must prove: 1) that BancPLUS was authorized under the laws of the United States; 2) that the defendants were officers or directors of BancPLUS; 3) that the defendants knowingly and willfully misapplied BancPLUS funds; 4) that the defendants misapplied these funds with the intent to injure or defraud the institution. *Parks*, 68 F.3d at 863. The government can prove the necessary

---

[6] This statute provides:

> Whoever, being an officer, agent, or employee of . . . any lending [institution] . . . authorized or acting under the laws of the United States or any institution . . . the accounts of which are insured by the Federal Deposit Insurance Corporation, willfully misapplies any moneys, funds, credits, securities, or other things of value belonging to such institution . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 657.

intent by "'showing a knowing, voluntary act by [each] defendant, the natural tendency of which may have been to injure the bank even though such may not have been his motive.'" *Id.* (quoting *United States v. Parekh*, 926 F.2d 402, 408 (5th Cir. 1991)).

The defendants contend that the government failed to prove that they misapplied BancPLUS funds. Relying on our decision in *Beuttenmuller*, they argue that the government failed to prove a criminal misapplication because BancPLUS sold burdensome property, reduced its real estate holdings, and obtained something of value—the Dallas property—in exchange for the $26 million purchase price and the $15 million down payment. The government, on the other hand, argues that BancPLUS's purchase of the Dallas property for $26 million constituted a criminal misapplication of BancPLUS funds because the defendants knew that Scott's Cattle had paid only $13 million for the property a few days before.

In *Beuttenmuller*, Shamrock Savings, like BancPLUS, owned burdensome real estate—the Tanglewood property. 29 F.3d at 975. Shamrock decided to sell the Tanglewood property because it was causing the savings and loan substantial losses. The Southmeadow Joint Venture, which was formed by Larry Gill and Richard Billings, expressed interest in purchasing the Tanglewood property. At that time, Gill and Billings were also operating the Mansfield 150 Joint Venture to develop some real estate known as the Mansfield property, which had an appraised value of over $4 million and an equity value of approximately $1.8 million.[7] Just as Pettigrew, through Scott's Cattle, conditioned the Cal-Tex purchase of the Houston property on BancPLUS's agreement to buy the Dallas property, Gill and Billings, through the Southmeadow Joint Venture, conditioned their agreement to purchase the Tanglewood property on Shamrock's agreement to buy a 45% share in the Mansfield 150 Joint Venture, which owned nothing but the Mansfield property. *Id.* at 975-76.

Shamrock agreed to the conditional sales and the parties established a circular funding arrangement identical to the one in this case. Shamrock agreed to purchase a 45% share of the

_____

[7] As the term is used in *Beuttenmuller*, equity value is calculated by subtracting the debts owed on a piece of property from its appraised value. 29 F.3d at 980 n.15.

Mansfield 150 Joint Venture for $753,000. In exchange, the Southmeadow Joint Venture agreed to purchase the Tanglewood property for $2.725 million with a 20% down payment of $555,000. Gill and Billings then returned $555,000 of the $753,000 Shamrock payment to Shamrock as Southmeadow Joint Venture's down payment on the Tanglewood property. *Id.* at 975-77.

Like BancPLUS, Shamrock recorded an immediate profit on the sale of its property. *Id.* at 977. As in this case, however, Shamrock later foreclosed on the real estate it sold when the purchaser defaulted on its loan. *Id.* at 978.

As a result of their roles in this transaction, Gill and Billings were indicted. Gill was charged with aiding and abetting bank fraud and the misapplication of Shamrock funds. Beuttenmuller, the lawyer responsible for closing the transaction for Shamrock, was charged with conspiracy to commit bank fraud. Both were tried before a jury, and both were convicted. *Id.*

On appeal, this court reversed their convictions reasoning that Shamrock's purchase of a 45% interest in the Mansfield Joint Venture and its circular funding of the Southmeadow Joint Venture down payment on the Tanglewood property could not constitute a criminal misapplication of funds or bank fraud unless "Shamrock Savings effectively gave Gill and Billings the down payment money" for the purchase of the Tanglewood property. *Id.* at 979. But as the court noted, Shamrock did not provide Gill and Billings this down payment money as a gift. Instead, by investing in the Mansfield 150 Joint Venture, Shamrock acquired a 45% interest in the Mansfield property. *Id.* at 979-80. Under these circumstances, criminal liability for bank fraud and misapplication turned on whether "the Mansfield property had no value" or the value of this property "was so low that the transaction was essentially a sham designed to cover the fact that Shamrock Savings was gratuitously providing Gill and Billings with the down payment money." *Id.* at 980.

The court concluded that a reasonable juror could not find beyond a reasonable doubt that the transaction was a sham. In exchange for its $753,000 cash payment, Shamrock obtained a 45% interest in property with an appraised value of over $4 million and approximately $1.8 million in equity value. Thus, the record in *Beuttenmuller* clearly indicated that the sale of the Mansfield

16

property to Shamrock was not part of a "criminal venture" because it was "within the range of a value-for-value transaction." *Id.*

Given the factual parallels between this case and *Beuttenmuller*, we find that the defendants' convictions for misapplication cannot stand unless the government's evidence sufficiently demonstrates that BancPLUS's payment of $26 million for the Dallas property was outside the range of a value-for-value transaction. Notwithstanding the fact that the price that Scott's Cattle paid for the Dallas property was not a matter of public record and the absence of evidence indicating that anyone who knew of this price provided it to the defendants, the government argues that BancPLUS's $26 million purchase price was not within the range of a value-for-value transaction because the defendants knew that Scott's Cattle had paid only $13 million for this property. In support of its contention that the defendants were aware of the Scott's Cattle purchase price, the government points to evidence in the record that Century Corporation, which owned BancPLUS, also owned Texas National Title, where the records documenting the Scott's Cattle purchase price were located. To show that the defendants had access to the records at Texas National Title, the government notes that Carlton testified on cross examination that the defendants arranged for her to have access to the records at Texas National Title upon her request.[8] From these two pieces of evidence, the government contends that the jury could reasonably infer that the defendants gained access to the records and Texas National Title and discovered Scott's Cattle's $13 million purchase price.

For this inference to be a reasonable one, and not the result of unguided speculation, the government needed to provide the jury with at least two pieces of additional evidence: 1) testimony or corporate documents demonstrating that the defendants could have taken certain steps to obtain for themselves the records at Texas National Title documenting Scott's Cattle's $13 million purchase price for the Dallas Property; and 2) testimony indicating that the defendants were likely to have

---

[8] The defendants elicited this testimony to show that they cooperated with the FHLBB investigation.

17

taken these steps in the three days following Scott's Cattle's purchase of the Dallas property from Lintex Land. The government, however, never asked its witnesses from Texas National Title whether the defendants, by virtue of their positions at BancPLUS or Century Corporation, had or were given access to the records at Texas National Title documenting the price Scott's Cattle paid for the Dallas property. Likewise, the government failed to elicit testimony explaining why the defendants would have sought these records in the three days preceding the simultaneous closings on BancPLUS's sale of the Houston property and purchase of the Dallas property. We therefore hold that the government failed to prove sufficiently that the defendants knew, at the time BancPLUS purchased the Dallas property for $26 million, that Scott's Cattle was selling this property for a $13 million profit.

Consequently, there were only two pieces of evidence before the jury establishing the value of the Dallas property at the time of BancPLUS's purchase. On the one hand, Merwin's memorandum, which was sent to Ross and Barber, indicated that the $26 million purchase price was $6 million over fair market value. On the other hand, Brandt's appraisal, which was furnished to the defendants, suggested that the Dallas property was worth $35 million. Although the government argues that the jury could discredit this appraisal because it was paid for by Pettigrew, this argument ignores the fact that Brandt's prior appraisals on the Dallas property clearly indicated that Pettigrew's involvement did not affect Brandt's valuation. Thus, the evidence before the jury established that BancPLUS knew that the Dallas property had a fair market value between $20 and $35 million and agreed to the $26 million price after performing due diligence. Under these circumstances, a reasonable juror could not conclude that a purchase price of $26 million was outside the range of a value-for-value transaction.

In the alternative, the government, focusing solely on the purchase of the Dallas property, argues that the $6 million portion of the $15 million down payment that was not used to fund the Cal-Tex down payment on the Houston property represents a separate misapplication. We do not dispute that there may be circumstances where a large down payment will constitute a misapplication even when part of a value-for-value transaction. The government, however, did not prove a criminal

18

misapplication in this case simply by demonstrating that the defendants, in order to secure Pettigrew's purchase of the Houston property, provided him with a $15 million rather than a $9 million down payment on the Dallas property. To impose criminal liability under these circumstances would punish the defendants for taking the steps necessary to sell BancPLUS's nonperforming property and reduce its real estate holdings. For the portion of the BancPLUS down payment that was not used to fund the Cal-Tex down payment on the Houston property to constitute a criminal misapplication of BancPLUS funds, the government was obligated to prove that this excess funding was itself a sham. *Cf. id.* at 980 (requiring proof that value was not received in exchange for value given).[9]

Although the government does not expressly argue that BancPLUS did not receive value in exchange for the additional $6 million, it implies that the defendants knew, or had reason to believe, that Pettigrew, through Cal-Tex, was unlikely to return this money in the form of loan payments on the Houston property. *Cf. Parekh*, 926 F.2d at 407 (stating that a loan is a sham "if there was little likelihood or expectation that the named debtor would repay") (quotations omitted). The evidence, however, shows that the defendants investigated Pettigrew's financial condition before selling the Houston property to Cal-Tex and determined that Pettigrew had the resources, independent of the proceeds of the sale of the Dallas property, to make this purchase and to make him a good credit risk. Accordingly, without additional evidence indicating that Pettigrew was unlikely to repay the BancPLUS loan, a reasonable juror could not conclude that the large down payment was a sham rather than a necessary component of a value-for-value transaction. *Cf. id.* (holding that proof of the debtor's ability to repay the loan will not necessarily preclude a finding that the loan was a sham when there is additional evidence suggesting that the borrower is nevertheless unlikely to repay).

In conclusion, we hold that the evidence was insufficient to sustain the defendants' convictions for misapplying BancPLUS funds under either of the government's theories. We

_____

[9] This theory of fraud could also be used, although not on the facts of this case, to demonstrate that the circular funding in an otherwise facially valid value-for-value transaction constituted a criminal misapplication of funds.

therefore affirm the district court's decision to acquit each defendant on the charges that he conspired to misapply BancPLUS funds and misapplied BancPLUS funds. *Beuttenmuller*, 29 F.3d at 980 ("Because the government has failed to provide sufficient evidence that the object of the conspiracy was illegal, we reverse Beuttenmuller's conviction for conspiracy.").

## C. Bank Fraud

To establish bank fraud in violation of 18 U.S.C. § 1344(1),[10] the government must prove: 1) that the "defendant[s] engage[d] in . . . a pattern or course of conduct designed to deceive [BancPLUS], a federally chartered or insured institution, into releasing property;" and 2) that the defendants acted with the "intent to victimize [or injure BancPLUS] by exposing it to actual or potential loss." *United States v. Stavroulakis*, 952 F.2d, 686, 694 (2d Cir. 1992).[11]

The defendants contend that the government's evidence was insufficient to show that they acted with the requisite intent because the purchase of the Dallas property was a value-for-value transaction. In response, the government once again argues that the purchase of the Dallas property was a sham that caused BancPLUS an actual loss of $13 million—the difference between the prices paid by BancPLUS and Scott's Cattle. The government maintains that the evidence was sufficient to show that the defendants negotiated and approved the purchase of the Dallas property with the

---

[10]    In relevant part, the broad language of this statute imposes criminal liability on "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution." 18 U.S.C. § 1344(1).

[11]  This statement of the elements of a § 1344 offense is a succinct summation of our holdings on this subject. *See, e.g.*, *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992) (defining a "scheme to defraud" to include "any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived" and stating that the "requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself"); *see also United States v. Barakett*, 994 F.2d 1107, 1111 (5th Cir. 1993) (holding that a "knowing execution of [a] scheme[] causing [a] risk of loss—rather than actual loss—to the institution, can be sufficient to support [a] conviction"); *Parekh*, 926 F.2d at 408 (holding that the "intent to defraud" element, in the context of a false entry charge, "is proven by showing a knowing, voluntary act by the defendant, the natural tendency of which may have been to injure the bank even though such may not have been his motive.") (quotations omitted).

20

intent to injure BancPLUS because they knew of Scott's Cattle's purchase price.

As we have noted, however, the government failed to prove that the defendants knew that Scott's Cattle purchased the Dallas property for $13 million. Consequently, the government also failed to prove that the defendants acted with the intent to injure BancPLUS by causing it a $13 million actual loss. In fact, because BancPLUS's purchase of the Dallas property was a value-for-value transaction, the evidence indicates that the risk of loss associated with BancPLUS's purchase of the Dallas property was the risk of overpayment inherent in every decision to acquire valuable real estate for value.[12] We therefore also find that the government failed to show that the purchase of the Dallas property exposed BancPLUS to a risk of loss sufficient to support criminal liability for bank fraud. *Cf. Beuttenmuller*, 29 F.3d at 981 (implying that the risk of overpayment in a value-for-value transaction is insufficient to sustain a conviction for bank fraud because this type of transaction is not a "criminal venture").

In the alternative, the government contends that the circular funding of Pettigrew's down payment on the Houston property exposed BancPLUS to a potential loss by elevating the risks associated with this otherwise lawful transaction. As we discussed in connection with our analysis of the government's proof of misapplication, a bank's circular funding of a down payment on bank property may lead to criminal liability if bank officials know or have reason to believe that the purchasing party will be unable to repay its loan. In such cases, a risk of loss exists because the bank is likely to reacquire costly property. *Saks*, 964 F.2d at 1519. Further, insofar as a bank provides a purchaser with funds exceeding a 20% down payment on bank property but requires only a 20% down payment notwithstanding the likelihood that this purchaser will default, there is a greater risk associated with the circular funding because the bank is unlikely to see the return of the excess funds

---

[12] The government did not argue that this transaction posed a risk of loss because BancPLUS needed the down payment funds on the Dallas property to satisfy other obligations and, in light of our holding that the transaction was not a sham, could not argue that the purchase of the Dallas property constituted bank fraud because it precluded the use of these funds for legitimate banking purposes. *See Parekh*, 926 F.2d at 408.

21

in the form of loan payments.

These risks, however, were not present in this case because BancPLUS determined that Pettigrew could have paid the down payment on the Houston property with funds unrelated to the proceeds of the sale of the Dallas property and was a creditworthy borrower. Thus, from a risk perspective, it was immaterial whether the down payment funds came from the sale of the Dallas property or whether Pettigrew transferred the funds from his bank account to BancPLUS and then immediately replaced these funds with the BancPLUS down payment on the Dallas property. Consequently, the risk of default associated with the sale of the Houston property to Pettigrew was no different than the risk of default that accompanies every loan properly made to a creditworthy individual. Thus, we also find that the government failed to show that the circular funding of the Cal-Tex down payment on the Houston property exposed BancPLUS to a risk of loss sufficient to support criminal liability for bank fraud. *Cf. Beuttenmuller*, 29 F.3d at 981 (voiding a conviction for bank fraud notwithstanding the fact that he defaulted on his loan from the bank that circularly funded his down payment on the purchase of bank real estate); *Parekh*, 926 F.2d at 407 (suggesting that additional evidence regarding the risk of default is necessary to establish bank fraud in these circumstances); *United States v. Bridges*, 820 F. Supp. 475, 476 (W.D. Mo. 1993) (acquitting the defendant of bank fraud because "[i]f there was a risk [of loss] suggested in the present case, it cannot be classified as high risk, or anything demonstrably more hazardous than the risk of a normal loan.").[13] Because the government failed to provide sufficient evidence regarding BancPLUS's exposure to an actual or potential loss, we affirm the district court's decision to acquit the defendants on the charges of conspiring to commit bank fraud and committing bank fraud. *Beuttenmuller*, 29

---

[13] The government also argues that Carlton's testimony that unspecified conduct by the defendants exposed BancPLUS to civil sanctions was sufficient to prove BancPLUS's exposure to a potential loss. *See Parekh*, 926 F.2d at 408. We reject this argument because the jury had no basis for connecting this testimony with the government's theories of bank fraud. In fact, given its context, this statement likely refers to the purported impropriety of BancPLUS's recording a profit on the sale of the Houston property in light of the circular funding rather than the propriety of the circular funding itself under federal banking regulations.

F.3d at 980 ("Because the government has failed to provide sufficient evidence that the object of the conspiracy was illegal, we reverse Beuttenmuller's conviction for conspiracy.").

IV.

For the foregoing reasons, we REVERSE the judgment of acquittal for each defendant on the false entry count and the related conspiracy charge, AFFIRM the district court's decision to grant each defendant a new trial on the false entry count and its conspiracy counterpart, REMAND for a new trial on these two charges, and AFFIRM the judgment of acquittal for each defendant on the misapplication of funds and bank fraud counts and the related conspiracy charges.